FILED

2025 Jun-07  PM 05:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**JOHN HORNBUCKLE**

**v.**

**UNITED STATES OF AMERICA**

**Civ. 5:24-cv-8006**
**Crim. 22-cr-78**

# UNITED STATES' RESPONSE TO
# JOHN HORNBUCKLE'S SECTION 2255 MOTION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................1

I.      The Murphy trial provides overwhelming evidence of Hornbuckle's guilt....2

II.     Hornbuckle is charged, and others are charged and convicted of related crimes.....................................................................................................5

III.    Hornbuckle retains experienced counsel to litigate his case and eventually pleads guilty...............................................................................................6

IV.     Hornbuckle files a Section 2255 motion. .........................................................9

V.      Hornbuckle provides selective, edited clips of secret recordings he apparently made of conversations with his lawyer. ......................................10

STANDARDS.................................................................................................12

ARGUMENT ....................................................................................................14

I.      Hornbuckle's ineffective-assistance claims fail. ............................................14

        A.      Hornbuckle has not made any showing of ineffective assistance at the plea stage (grounds 1 and 7)................................................................14

                1.      The record refutes Hornbuckle's allegations that his counsel coerced his guilty plea (ground 1). ...........................................14

                2.      The record refutes Hornbuckle's allegations about the plea advice he received (ground 7)....................................................17

        B.      Hornbuckle has not made any showing of ineffective assistance in trial preparation or case investigation (grounds 2, 3, 4, 5)..................20

        C.      Hornbuckle has not made any showing of ineffective assistance because of an attorney conflict of interest (ground 8). ......................26

        D.      Hornbuckle has not made any showing of ineffective assistance at sentencing (ground 7).........................................................................27

II.     Hornbuckle's coerced-plea claim (ground 9) fails. ........................................28

III.    Hornbuckle's actual innocence arguments (grounds 10 and 11) fail. ...........29

IV.     Hornbuckle's Thirteenth Amendment claim (ground 6) fails.......................31

CONCLUSION ...................................................................................................32

## INTRODUCTION

The United States opposes John Hornbuckle's motion to vacate his sentence under 28 U.S.C. § 2255 (Civ. ECF 1).[1] Hornbuckle contends that his lawyers provided ineffective assistance because they coerced him to plead guilty, gave him faulty plea advice, failed to prepare for trial, and failed to object at sentencing, and because one lawyer had a conflict of interest. He also makes a freestanding coerced-plea claim, argues he is innocent, and says the government violated his Thirteenth Amendment rights by prosecuting him. The ineffective-assistance claims fail because Hornbuckle has not sufficiently alleged constitutionally deficient performance, let alone prejudice. The coerced-plea and actual-innocence claims are procedurally barred and meritless. The Thirteenth Amendment claim is frivolous. The motion should be denied without a hearing.

## BACKGROUND

John Hornbuckle was charged with, pleaded guilty to, and is serving a sentence for running a health care fraud and kickback scheme pitched to Alabama pain doctors. The month before Hornbuckle was charged, a jury convicted one of those doctors, Mark Murphy, and his wife and office manager, Jennifer Murphy, of

---

[1] In this response, the government uses "Civ. ECF" to identify documents filed in this Section 2255 case, and "Crim. ECF" to identify documents filed in the underlying criminal case.

1

crimes including taking kickbacks from Hornbuckle. In the months after Hornbuckle's indictment, others were charged with related crimes. All but one pleaded guilty before Hornbuckle; another co-conspirator pleaded guilty afterward.

## I.    The Murphy trial provides overwhelming evidence of Hornbuckle's guilt.

The Murphys were convicted after a trial during which the government presented overwhelming evidence of Hornbuckle's fraud and kickback scheme. For much of the 2010s, Hornbuckle was the owner, president, and CEO of QBR, a company in the business of nerve conduction testing. Feb. 21, 2022 Trial Tr. at 185–186, Doc. 163, *United States v. Murphy, et al.*, 5:20-cr-291 (N.D. Ala.) (Hornbuckle's nephew Brian Clark testifying that he went to work for Hornbuckle after college and learned about the business). QBR paid technicians to visit doctors' offices and conduct the tests, and QBR paid sales reps to market the tests to pain clinics. *Id.* at 186; *id.* at 131–132, 148–149 (former QBR technician John Patton testifying about the work). Tests were billed to insurance using codes representing the number of nerves tested; at QBR, the highest-billing code—for thirteen or more nerves tested—was "the most common billing code." *Id.* at 157 (former QBR employee Susan Bassham testifying about the billing codes); *id.* at 193 (Clark testifying that QBR most often used the "highest paying code").

QBR paid doctors to induce them to order more tests—a flat fee for each test ordered. In total, QBR allocated $125 per test to be divided between the doctor and

the QBR sales rep. *Id.* at 186 (Clark testifying about how he learned QBR paid doctors a flat rate per test); *id.* at 143, 148–149 (Patton testifying he learned from Hornbuckle that QBR paid $125 per test ordered, split between the clinic and the QBR salesperson for that clinic); *id.* at 157 (former QBR employee Susan Bassham testifying she believed QBR used a "calculation" to pay doctors who ordered tests).

Murphy was QBR's biggest money-maker. *Id.* at 158 (Bassham testifying to email about Murphy's having ordered sixty-seven percent of all QBR tests that month); *id.* at 187, 190, 219–220 (Clark testifying Murphy was the top ordering doctor for QBR and comprised "[p]robably forty percent of our business"). Murphy ordered tests for his patients twice a year regardless of medical need, and his patients were required to undergo the tests if they wanted to get their pain medications. *Id.* at 132–133, 143 (Patton testifying technicians were required to do tests on every patient Murphy's office sent QBR, "even if we questioned it," some patients tried to refuse the tests, and Murphy's son told a patient he could not get his pain medication unless he had the test).  That was true even though the tests were painful, patients did not want to have the tests, and Murphy did not explain why they needed the tests or review the results or change their treatment. *Id.* at 107 (one Murphy patient testifying the tests "hurt[]," they felt like "[e]lectricity going through you," he found out he was getting a nerve test only when he arrived at the office for his appointment and did not know why, and he never received the results or recalled speaking with

3

Murphy about them); *id.* at 132–133 (Patton testifying the tests were "not comfortable" for patients).

QBR paid Murphy a million dollars for his test orders. Feb. 24, 2024 Trial Tr. at 51, Doc. 166, *United States v. Murphy, et al.*, 5:20-cr-291 (N.D. Ala.) (Murphy admitting that QBR paid him a million dollars). Murphy claimed the money represented a "supervision fee," but he admitted he was not in the room for the tests, sometimes was not even in the office, did not interpret the test results, and did not sign the (photocopied) test orders. *Id.* at 51–52. He also admitted QBR's payments "motivated" him to order more tests. *Id.* at 53. A secret video recording Brian Bowman, a QBR sales rep, had made inside the Murphys' clinic showed Jennifer Murphy shaking Hornbuckle down for money to compensate the Murphys for the tests they ordered. Feb. 21, 2022 Trial Tr. at 196–204, Doc. 163, *United States v. Murphy, et al.*, 5:20-cr-291 (N.D. Ala.); *see* Feb. 17, 2024 Trial Tr. at 136, Doc. 177, *United States v. Murphy, et al.*, 5:20-cr-291 (N.D. Ala.) (Sharon Luttrell testifying Hornbuckle wrote checks to the Murphys, not once but "many times").

A few months before the Murphy trial, Brian Bowman, a Hornbuckle sales rep, pleaded guilty to taking a million dollars in QBR kickbacks for inducing Murphy to order QBR tests. Bowman Plea Agreement at 5, Doc. 100, *United States v. Murphy et al.*, 5:20-cr-291 (N.D. Ala. filed Dec. 3, 2021). At the Murphy trial, Bowman admitted on the stand that he had participated in paying kickbacks to the

Murphys for QBR tests Murphy ordered. Feb. 22, 2024 Trial Tr. at 129, Doc. 164,

*United States v. Murphy, et al.*, 5:20-cr-291 (N.D. Ala.).

## II.    Hornbuckle is charged, and others are charged and convicted of related crimes.

Shortly after the Murphy trial, Hornbuckle was indicted for health care fraud and kickback conspiracy. Indictment, Crim. ECF 1 (filed Mar. 29, 2022). The indictment charged Hornbuckle with paying kickbacks to Murphy and other doctors for ordering nerve conduction tests that would be billed to federal health insurers—textbook violations of the Anti-Kickback Statute. The indictment also charged Hornbuckle with health care fraud, for billing insurers for medically unnecessary tests that had been ordered because the ordering doctor was paid to do so.

Within the next year, several others who worked with Hornbuckle or received kickbacks from him were charged in related cases: John Robson and James Ray, two sales reps who, like Bowman, received QBR kickbacks; Eric Beck, Hornbuckle's business partner and the doctor whose provider number was used to bill insurers for the QBR tests; and David Shehi, a pain clinic owner who took QBR kickbacks for the tests his doctor ordered. *See* Information, Doc. 1, *United States v. Beck*, 5:22-cr-103 (N.D. Ala.) (filed Apr. 7, 2022); Indictment, Doc. 1, *United States v. Ray*, 4:22-cr-357 (N.D. Ala.) (filed Sept. 27, 2022); Information, Doc. 1, *United States v. Shehi*, 4:23-cr-46 (N.D. Ala.) (filed Feb. 13, 2023); Indictment, Doc. 1, *United States v. Robson*, 2:23-cr-71 (N.D. Ala.) (filed Feb. 23, 2023). Beck, Ray, and Shehi pleaded

guilty while Hornbuckle's case was pending. *See* Plea Agreement, Doc. 2, *United States v. Beck*, 5:22-cr-103 (N.D. Ala.) (filed Apr. 7, 2022); Plea Agreement, Doc. 15, *United States v. Ray*, 4:22-cr-357 (N.D. Ala.) (filed Nov. 2, 2022); Plea Agreement, Doc. 2, *United States v. Shehi*, 4:23-cr-46 (N.D. Ala.) (filed Feb. 13, 2023). Robson later pleaded guilty, too. *See* Plea Agreement, Doc. 50, *United States v. Robson*, 2:23-cr-71 (N.D. Ala.) (filed Jan. 29, 2024).

## III. Hornbuckle retains experienced counsel to litigate his case and eventually pleads guilty.

Before indictment, Hornbuckle retained Max Pulliam, a criminal defense lawyer with nearly forty years of experience, to represent him. Ex. 1 (Pulliam Aff.) at 1. Pulliam represented Hornbuckle throughout the case, including during the run-up to trial, for the eventual plea, and at sentencing. *Id.* Pulliam competently investigated the case. *Id.* He reviewed the evidence, had multiple meetings with the government about it, and had several dozen discussions with Hornbuckle about the case, the evidence, preparations for trial, and a possible resolution. *Id.* at 1–2.

As trial approached, Hornbuckle added another experienced white-collar defense lawyer, Joshua Lowther, to his team. Ex. 2 (Lowther Aff.) at 1. As Lowther got up to speed on the case, he quickly realized Hornbuckle did not have a viable defense. *Id.* at 2. Hornbuckle was focused on blaming his main business partner, Chris McCutcheon. *Id.* at 3. McCutcheon had partnered with Hornbuckle at QBR for a few years before leaving the company and filing a lawsuit against Hornbuckle,

6

QBR, and others alleging fraud. *See* Complaint, Doc. 1, *McCutcheon v. QBR LLC et al.*, 5:17-cv-562 (N.D. Ala. filed Mar. 24, 2017). Pulliam and Lowther had extended discussions with Hornbuckle about the strength of the expected evidence at trial and the inadmissibility of the evidence Hornbuckle wanted to present, which would not have been relevant to his own guilt. Ex. 2 at 3.

With Hornbuckle's permission, Lowther asked the government for a proposed plea agreement. *Id.* at 4. The lawyers reviewed with Hornbuckle his expected Guidelines range, his possible range of punishment, and the possibility of credit should Hornbuckle provide substantial assistance to the government. *Id.*

Hornbuckle agreed to plead guilty. *Id.* The day before the plea hearing, and again the morning of the hearing, Lowther spoke at great length with Hornbuckle about the hearing, the agreement, sentencing, and cooperation possibilities. *Id.*

At the plea hearing, the Court made clear that the hearing was set "as an opportunity for you to plead guilty, if you wish to do that. It doesn't matter to me if you do plead guilty or not." Crim. ECF 46 at 3. The Court emphasized the importance of honesty: "Make sure to tell me the truth. You're in enough trouble. You don't want perjury added to it." *Id.* After Hornbuckle was sworn in, he told the Court that he understood the charges against him. He described his two lawyers as having done a "[g]reat job" for him, said he had no "complaints about their representation," and agreed that the lawyers had spent "a sufficient amount of time

helping [him] with [his] case, talking to [him] about it, investigating the case, and things like that." *Id.* at 6. Finally, Hornbuckle assured the Court that his decision to plead guilty was voluntary:

> COURT:              Has anybody threatened you, forced you or coerced
>                     you in any way to get you to plead guilty?
>
> HORNBUCKLE:  No, sir.
>
> COURT:              Anybody offered you any reward for pleading
>                     guilty?
>
> HORNBUCKLE:  No, sir.
>
> COURT:              Are you wanting to plead guilty because you are in
>                     fact guilty?
>
> HORNBUCKLE:  Yes, sir.

*Id.* at 16–17.

The presentence investigation report prepared before sentencing calculated Hornbuckle's Guidelines range as 70 to 87 months. Hornbuckle's counsel filed objections to the presentence report for including a four-level organizer/leader enhancement. Crim. ECF 33. At sentencing, the government presented documentary and testimonial evidence for the enhancement, including more than a dozen exhibits showing Hornbuckle's role. Crim. ECF 57 at 6–25. The Court overruled the objection, applied the enhancement, and imposed a Guidelines-range sentence of 80 months. *Id.* at 25–26, 35. The Court explained that Hornbuckle's conduct was "just simply greed." *Id.* at 34. It "is extremely serious"—"you stole $9 million." *Id.* The

8

Court recognized that Pulliam "has made, you know, good arguments" for Hornbuckle. *Id.* But Hornbuckle had not shown remorse toward the victims of his crimes: "when you were apologizing, your apologies were to the immediate crowd, not the patients that underwent these tests. I remember them talking about [the tests] being painful in trial. The money that was taken from other people that—you know, that's just thieving. Your apologies were not for any of those folks." *Id.*

## IV.    Hornbuckle files a Section 2255 motion.

Hornbuckle did not file a direct appeal. In March 2024, Hornbuckle timely filed a Section 2255 motion asserting ineffective assistance of counsel at the plea and trial preparation stages. Civ. ECF 1. In the motion, Hornbuckle cited several pieces of evidence that he did not attach or provide: unspecified "electronic source data evidence," *id.* at 8, 15, 21; emails with counsel, *id.* at 13 n.4, 32 n.11; and communications with counsel regarding the "list of witness" Hornbuckle said should have been interviewed because they had unspecified relevant testimony to give, *id.* at 9, 11.

The Court asked the government to respond to the Section 2255 motion. Civ. ECF 3. The government moved to extend the deadline to answer and asked the Court to order Hornbuckle to produce the evidence on which he relied. Civ. ECF 4. The Court granted the motion. Civ. ECF 5. Hornbuckle was ordered "to provide the evidence he cites and relies on in support of his § 2255 motion." *Id.* at 2.

## V.    Hornbuckle provides selective, edited clips of secret recordings he apparently made of conversations with his lawyer.

Hornbuckle eventually submitted to the Court, which provided a copy to the government, a flash drive containing three "Partial Audio Recordings of the attorney Max Pulliam and Defendant JOHN HORNBUCKLE." Civ. ECF 11 at 2.[2]

The recordings appear to be covert—secretly recorded by Hornbuckle without his lawyer's knowledge. They are also selective—beginning or ending mid-sentence or mid-thought, cutting off just as Pulliam begins to review key evidence with Hornbuckle, and comprising only fifteen minutes from the many dozens of hours Hornbuckle and Pulliam spent in conversation about the case. *See* Ex. 1 at 1–2.

The first selectively edited clip, titled "You'll End up in a GD River," is just sixteen seconds and starts midsentence: "—never know how lucky you might get in this business. You might catch a break; you might not. I mean, Mac and those ****ers—I don't want anything to do with them. I mean, you'll end up in a ******* river." The tone is measured, and the reference to ending up in a river plain hyperbole.

The second selectively edited clip, titled "Loftin Towne," is a minute long. In it, the speaker refers to an unnamed third person—"he"—who will "get caught one day," will "cross the wrong person. . . all you've got is your reputation. He'll cross

---

[2] Hornbuckle did so belatedly, but, as the docket reflects, that may have been the result of some confusion about Hornbuckle's prison address. Civ. ECF 12.

somebody. He'll end up in a damn Tennessee river. Hell, Town may put him there. Or Town's folks." This statement, too, appears to be hyperbolic.[3]

The third selectively edited clip is fourteen minutes long. In the clip, Pulliam discusses damning evidence against Hornbuckle: the video Bowman had secretly made in the Murphys' office. Hornbuckle says, "I'll be surprised if I'm in it." Pulliam responds that they need to watch the video, because Hornbuckle is visible and it is apparent what he and Jennifer Murphy are discussing. Pulliam also notes that Judge Coogler, who presided over the trial where the video was "played in front of a jury that convicted the Murphys," remembered the video and mentioned it during a recent teleconference about Hornbuckle's case. The two also discuss Hornbuckle's feelings about the McCutcheons, whom Hornbuckle suggests are protected, and Pulliam goes along with Hornbuckle to build credibility. *See* Ex. 1 at 3. But Pulliam focuses on the evidence. He describes how the government would present the video in context through the testimony of Bowman, former QBR partner Eric Beck, and other witnesses. He explains the government's theory of the case is that "the nerve conduction study tests were done regardless of medical need. . . . They've already proved to a jury's satisfaction that the Murphys were ordering tests regardless of medical necessity. . . . This film was played during the Murphy trial

---

[3] The audio clip contains no date markers. Former U.S. Attorney Jay Town left the U.S. Attorney's Office in 2020, years before Hornbuckle's indictment.

11

over which Judge Coogler presided. . . . He's sending me a message that this is very damning." Pulliam also explains, "I believe you voluntarily got in the car with crazy and crooked, just like I've said before. You got in the car with them. Or as my grandfather would say, you lay down with dogs and you got fleas." The recording stops just as Hornbuckle and Pulliam begin to watch the video together.

## STANDARDS

"Section 2255 does not provide a remedy for every alleged error in conviction and sentencing." *Spencer v. United States*, 773 F.3d 1132, 1138 (11th Cir. 2014) (en banc). Relief under Section 2255 "is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988) (cleaned up).

Even for claims cognizable under Section 2255, the procedural default rule generally requires a petitioner to "advance an available challenge to a criminal conviction or sentence on direct appeal or else [be] barred from presenting that claim in a § 2255 proceeding." *Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004). A movant can overcome this bar only by establishing one of two exceptions: "cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error," or a "constitutional violation [that] has probably resulted in the conviction of one who is actually innocent." *Id.* at 1234–1235 (cleaned up).

A petitioner may avoid the procedural default rule by asserting a substantive claim of ineffective assistance of counsel. But to establish such a claim, the petitioner must show both constitutionally deficient performance and actual prejudice. *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014) (citing the test laid out in *Strickland v. Washington*, 466 U.S. 668 (1984)). The bar to meet each prong is high. To show deficiency, a petitioner "must demonstrate that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment." *Id.* Courts apply a "strong presumption that counsel's conduct fell within the range of reasonable professional assistance." *Id.* To show prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (cleaned up). To establish prejudice in the context of a guilty plea, a movant must establish that, but for his counsel's unprofessional errors, "he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 53, 59 (1985).

If a petitioner's claims are "patently frivolous" or "affirmatively contradicted in the record," the Court can deny them without a hearing. *Rosin v. United States*, 786 F.3d 873, 877 (11th Cir. 2015) (cleaned up); *see Lynn*, 365 F.3d at 1238–1239 (district court need not hold an evidentiary hearing where Section 2255 allegations are conclusory).

**ARGUMENT**

Hornbuckle has not shown that his lawyers coerced a guilty plea, failed to prepare for trial, or otherwise provided ineffective assistance; their affidavits and other record evidence show the opposite. Hornbuckle's substantive coerced-plea claim is procedurally barred and meritless. His actual-innocence claim lacks merit; it also is not a freestanding basis for collateral relief. And his Thirteenth Amendment argument is frivolous. The motion should be denied without a hearing.

**I.     Hornbuckle's ineffective-assistance claims fail.**

Hornbuckle asserts that his counsel provided ineffective assistance at the plea stage (by coercing him to plead guilty and giving faulty plea advice), at the pre-trial stage (by failing to prepare, failing to investigate, and failing to engage with the defense), and at sentencing (by failing to object to an enhancement). Hornbuckle also claims one lawyer had a conflict of interest. The record proves otherwise.

**A.     Hornbuckle has not made any showing of ineffective assistance at the plea stage (grounds 1 and 7).**

**1. The record refutes Hornbuckle's allegations that his counsel coerced his guilty plea (ground 1).**

Hornbuckle argues that his counsel extracted his guilty plea using "coercion and fear of retaliation and/or being murdered," including a "long history of threats." Civ. ECF 1 at 8; *see id.* at 10 (referring to "the counsels conduct which included threats of being murdered"). But the record contradicts those allegations.

First, Hornbuckle himself provided "powerful evidence . . . indicating that his guilty plea was knowing and voluntary." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014). As in *Winthrop-Redin*, Hornbuckle "initialed and signed the plea agreement, which specified that he had decided to plead knowingly and voluntarily, without threats, force, intimidation, or coercion." *Id.* at 1217; Crim. ECF 29 at 17–18 (Hornbuckle signing below the sentence "NO PROMISES OR REPRESENTATIONS OTHER THAN THOSE IN THE AGREEMENT HAVE BEEN MADE TO ME BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED TO INDUCE ME TO PLEAD GUILTY"). Hornbuckle also "testified under oath and in detail that his plea had not been induced by threats or force leveled against him or his family." *Winthrop-Redin*, 767 F.3d at 1217; Crim. ECF 46 at 16–17.

Second, as in *Winthrop-Redin*, Hornbuckle waited long after pleading guilty, "and only after all other avenues for relief from his sentence were exhausted, to say anything to the district court about alleged threats." 767 F.3d at 1217. That unexplained delay undermines his allegations.

Third, affidavits from Hornbuckle's lawyers confirm that Hornbuckle pleaded guilty knowingly and voluntarily, after informed, well-counseled deliberation. The affidavits chart the lawyers' careful efforts to explain to Hornbuckle the evidence against him, his sentencing exposure, and the costs and benefits of pleading guilty.

15

Ex. 1 at 3–4; Ex. 2 at 3–5. Both lawyers believe Hornbuckle was telling the truth when he said at his change-of-plea hearing that he was guilty and was pleading guilty voluntarily, not because of threat or coercion. Ex. 1 at 4; Ex. 2 at 5. Pulliam also described, from his own experience with Hornbuckle, the implausibility that Hornbuckle was fearful or cowed. Ex. 1 at 4.

Fourth, Hornbuckle's supposed evidence—the audio recordings he submitted to the Court—undercuts his coercion claim. Set aside the most obvious shortcoming of those "partial" recordings: Hornbuckle selectively edited them and has provided only tiny portions of conversations spanning many hours. Even Hornbuckle's short clips diffuse any coercion concerns. In the fourteen-minute clip, Pulliam is measured and careful in explaining to Hornbuckle the strength of the evidence against him— in particular the damning video recording that inculpated Jennifer Murphy (whom a jury convicted after watching it), Brian Bowman (who pleaded guilty to related crimes), and Hornbuckle (who is visible throughout as he and Jennifer Murphy discuss the kickback payments). At points, Hornbuckle appears to try to bait Pulliam into agreeing that Hornbuckle is being treated unfairly while his former business partner Chris McCutcheon remains protected and consequence-free. Pulliam goes along with Hornbuckle, in an effort to build credibility and trust. Ex. 1 at 3. But Pulliam continues to return the conversation to the important topics—what is the

evidence, what will the government prove, how will a jury view it. Hornbuckle's 38-page motion ignores that sound advice.

Hornbuckle's other two short clips do not suggest coercion, either. In both selectively edited clips, a speaker who appears to be Pulliam can be heard borrowing the hyperbolic metaphor of "ending up in a river" to describe a person's power or downfall. From Pulliam's tone, it is clear the phrase is a figure of speech. From the brevity and editing, the context is not apparent; nor is it clear that Hornbuckle wishes the context to come into view.

Finally, the improbability of Hornbuckle's other allegations undermines his coercion claim. Hornbuckle now says that, in August 2021, he "was attacked and brutally beaten by a group of masked men." Civ. ECF 1 at 20–21 n.6. A year earlier, he says, "he saw an explosive device rigged to detonate" on his car. *Id.* Hornbuckle's lawyers do not recall Hornbuckle's ever mentioning these (presumably memorable) events, and they have no reason to believe Hornbuckle's statements are true. Ex. 1 at 5; Ex. 2 at 5.

### 2. The record refutes Hornbuckle's allegations about the plea advice he received (ground 7).

Hornbuckle complains generally about plea advice he received: his counsel "inappropriately advised acceptance or refusal of the plea agreement which was not a set plea agreement with any terms of set relief," and he received "misinformation" about the "possible consequences." Civ. ECF 1 at 15, 16.

17

This claim founders, first, because Hornbuckle has not alleged constitutionally deficient performance. It is not clear what Hornbuckle faults his counsel for: advising acceptance or advising refusal, failing to negotiate better terms or failing to advise him about what the terms were, or something else. The allegations are too conclusory to evaluate. *See Winthrop-Redin*, 767 F.3d at 1219.

Second, Hornbuckle could not allege constitutionally deficient performance given his own words. Hornbuckle assured the Court at his plea hearing that his lawyers had done a "[g]reat job" advising him about his case. Crim. ECF 46 at 6. He also assured the Court that his lawyers had reviewed with him the possible consequences of pleading guilty, and that he understood he could go to prison for up to five years (for count 1) and up to ten years (for count 2). *Id.* at 10–11. Hornbuckle's "solemn declarations in open court carry a strong presumption of verity." *Winthrop-Redin*, 767 F.3d at 1217 (cleaned up). And because he made the statements under oath, Hornbuckle "bears a heavy burden to show his statements were false." *Id.* (cleaned up). He has not done so.

Third, counsel's affidavits confirm that Hornbuckle's lawyers did not provide deficient performance. Instead, they properly and thoroughly advised Hornbuckle about the consequences of a guilty plea and about the costs and benefits of the plea agreement he signed. Ex. 1 at 3–4; Ex. 2 at 4. Contrary to Hornbuckle's suggestion, his lawyers did not promise him he would be able to avoid prison or assure him he

would get "a sentence of 11 months home confinement." *See* Civ. ECF 1 at 16–17; Ex. 1 at 3–4; Ex. 2 at 4.

Fourth, to the extent Hornbuckle's objection is to the terms of the deal his counsel negotiated (an agreement that did not cap his prison exposure), that could not support an allegation of deficient performance, either. "Counsel cannot force the Government to make a better plea deal, and counsel cannot make the Government's evidence go away or create evidence that does not exist." *Mendez-Ramos v. United States*, No. 5:17-cr-13, 2024 WL 4482129, at *9 (M.D. Ga. May 3, 2024) (report and recommendation). "[I]n deciding whether to enter a plea, defense lawyers carefully balance both opportunities and risks without fully knowing the strength of the prosecution's case." *Arvelo v. Sec'y, Fla. Dep't of Corr.*, 788 F.3d 1345, 1348–49 (11th Cir. 2015) (cleaned up). Courts therefore "afford substantial deference to a lawyer's strategic choices" in the plea negotiation context. *Id.*

Hornbuckle has especially little reason to complain because his lawyers secured a favorable outcome for him and nothing in his "argument or in the records indicates that a better deal was available," *Mendez-Ramos*, 2024 WL 4482129, at *9. The terms of Hornbuckle's deal included dismissal of a count that would have increased his Guidelines range, *see* U.S.S.G. § 2S1.1(b)(2); a stipulation to a loss amount of less than $9,500,000, which capped Hornbuckle's base offense level, *see* U.S.S.G. § 2B1.1(b)(1); a stipulation that Hornbuckle would be eligible for a three-

level reduction for accepting responsibility, *see* Crim. ECF 29 at 7; and an agreement that the government would recommend a Guidelines-range sentence, *see id.* Hornbuckle has not shown that his lawyers performed deficiently in negotiating the favorable plea offer he received and signed.

Finally, Hornbuckle has not alleged actual prejudice from whatever supposedly erroneous advice he complains of now. *See Hill*, 474 U.S. at 371. Hornbuckle suggests that he did not expect to receive as high a prison sentence as he got. Civ. ECF 1 at 16. But a petitioner "cannot establish prejudice on the mere basis that he had hoped for a lesser sentence." *Hall v. United States*, No. 19-cv-8032, 2022 WL 4295280, at *6 (N.D. Ala. Sept. 16, 2022), *vacated and remanded on other grounds*, 2024 WL 4224964 (11th Cir. Sept. 18, 2024).

### B.    Hornbuckle has not made any showing of ineffective assistance in trial preparation or case investigation (grounds 2, 3, 4, 5).

The record also refutes Hornbuckle's various conclusory complaints that his lawyers failed to investigate the case or prepare for trial or assist his defense (grounds 2, 3, 4, 5).

To start, the complaints contradict Hornbuckle's sworn assurances to the Court that his lawyers had done a "[g]reat job." Crim. ECF 46 at 6. Asked whether they had "spent what you think to be a sufficient amount of time helping you with your case, talking to you about it, investigating the case, and things like that," Hornbuckle agreed that they had. *Id.* There is a "strong presumption" that these

sworn statements "are true." *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994). That is doubly so here, where Hornbuckle made the statements moments after the Court warned him to be honest: "Make sure to tell me the truth. You're in enough trouble. You don't want perjury added to it." *Id.* at 3.

Bolstering Hornbuckle's sworn statements is the "strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (cleaned up). That presumption is even stronger in the context of "experienced trial counsel" such as Hornbuckle's lawyers. *Id.* at 1316; see Ex. 1 at 1 (describing Pulliam's nearly four decades of experience); Joshua Sabert Lowther Biography, Lowther Walker, https://federal-criminal-lawyer.com/our-attorneys/joshua-lowther/ (last visited June 2, 2025) (experienced federal criminal defense lawyer who represented defendant at trial and on appeal in another health care fraud case in this district, *United States v. Gladden*, 6:19-cr-219 (N.D. Ala.)).

Each of Hornbuckle's complaints fails for more specific reasons, too.

**Failure to investigate.** Hornbuckle asserts that Pulliam did not interview the witnesses Hornbuckle asked him to interview, did not answer Hornbuckle's communications, and did not engage with Hornbuckle on his defense. Civ. ECF 1 at 9, 10, 11. Similarly, Hornbuckle accuses Lowther of failing to prepare for trial once

he joined the case. *Id.* at 12–14. Hornbuckle has supplied no documents—no emails, text messages, or the like—to support his allegations of deficient performance. And Pulliam's and Lowther's affidavits refute them. Lowther met with Hornbuckle in person, "discussed the case at length," reviewed the indictment, explained "the elements of the offenses," "immediately began working with Mr. Pulliam to prepare for trial," and had "extended discussions with Mr. Hornbuckle about his proceeding to trial, the expected evidence, and the inadmissibility of evidence that Mr. Hornbuckle wanted to present," as well as specific "evidence of his guilt" that the government would offer. Ex. 2 at 1–3. Likewise, Pulliam investigated the case, had dozens of conferences with Hornbuckle, met with the government multiple times, reviewed the evidence, prepared for trial, investigated defenses, and advised Hornbuckle about the evidence that would and would not be inadmissible at trial. Ex. 1 at 1–3.

Hornbuckle suggests that Pulliam needed to interview every person he identified, regardless of whether their testimony would be relevant or admissible. But trial counsel has "no absolute duty . . . to investigate particular facts or a certain line of defense," nor must counsel "always investigate before pursuing or not pursuing a line of defense." *Chandler*, 218 F.3d at 1317–1318; *see id.* at 1318 ("Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly."). A main

22

line of defense Hornbuckle evidently wanted to pursue—that Chris McCutcheon was protected and had an interest in Hornbuckle's conviction to advance McCutcheon's civil suit—would have been inadmissible. (It also would have ignored the fact that McCutcheon left QBR years before Hornbuckle did and then blew the whistle on the fraud.) Hornbuckle also identifies no prejudice—no avenue of investigation that, had his lawyers pursued it, would have changed the outcome of his case.

**Failure to share key evidence.** Hornbuckle asserts that Pulliam did not share key evidence with him. Civ. ECF 1 at 11. This, too, is incorrect. Pulliam shared the government's evidence with Hornbuckle and reviewed it in detail. Ex. 1 at 1–2.

Even had Pulliam not done that, Hornbuckle does not explain how any of the material he mentions would have helped him. For example, Hornbuckle mentions QBR business records that Hornbuckle himself provided to the government on behalf of QBR in response to a subpoena before indictment. Hornbuckle also mentions the self-serving recorded proffers that Mark Murphy and Jennifer Murphy gave to the government before they were indicted. Those statements largely focused on other conduct and would not have been admissible in Hornbuckle's trial. They also included evidence that directly inculpated Hornbuckle: Mark Murphy's damning admission that QBR's payments to Murphy "motivated" him to order more tests. Feb. 24, 2024 Trial Tr. at 53, Doc. 166, *United States v. Murphy, et al.*, 5:20-

cr-291 (N.D. Ala.). Because the materials Hornbuckle cites would not have helped his case, he cannot show deficient performance or actual prejudice in any event.

**Reluctance to try the case.** Hornbuckle asserts that Pulliam did not want to try the case and suggested Hornbuckle hire another lawyer instead. Civ. ECF 1 at 11. That, too, is incorrect. Ex. 1 at 2–3. Hornbuckle voiced interest in bringing a second lawyer on board; Pulliam welcomed the assistance; and Lowther and Pulliam agreed to try the case together with "Hornbuckle's blessing." Ex. 1 at 2–3; Ex. 2 at 2–3. Hornbuckle does not explain how that was deficient performance or how he suffered prejudice by having the benefit of two experienced criminal defense lawyers rather than one.

**Failure to move for a continuance.** Hornbuckle asserts that Lowther told him Lowther would "get a continuance of the trial date." Civ. ECF 1 at 12. That is incorrect. Ex. 2 at 2. Lowther spoke with the government and with Pulliam about whether a continuance would be possible and was advised that it was unlikely. *Id.*; Ex. 1 at 3. Lowther also had prior experience to draw upon: in a prior health care fraud case in the same courtroom, Lowther had filed a motion to continue three weeks before trial, and that motion had been denied. *See* Mot. to Continue, Doc. 208, *United States v. Adams et al.*, 19-cr-219-LSC (N.D. Ala. filed Jan. 29, 2021); Text Order, Doc. 211, *United States v. Adams et al.*, 19-cr-219-LSC (N.D. Ala. filed Feb. 2, 2021) (denying motion). Pulliam and Lowther did not file the motion because they

reasonably believed it would be a strategic mistake. Ex. 2 at 3. That "strategic decision[]" is "entitled to a strong presumption of reasonableness." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (cleaned up). It does not demonstrate deficient performance. Hornbuckle also does not explain what prejudice the decision could have caused him.

**Failure to review evidence.** Hornbuckle complains that Pulliam "failed to review pieces of evidence and emails to ascertain their veracity." Civ. ECF 1 at 14. It is unclear what Hornbuckle's complaint is. Pulliam reviewed the evidence in detail—on his own, with the government, and with Hornbuckle. Ex. 1 at 1–2. Vague allegations belied by the record do not show deficient performance or prejudice.

**Failure to request a sentencing continuance earlier.** Hornbuckle also complains that Lowther promised to move to continue sentencing but "kept changing the date on which he said he would file" the motion. Civ. ECF 1 at 17. But Lowther did move to continue it, Crim. ECF 31—evidently just later than Hornbuckle wanted. There was no constitutionally deficient performance or prejudice in the timing of that filing. Lowther requested the continuance because he was in trial and wanted to participate in sentencing. But as the Court noted in denying the motion, "in all the proceedings of this case, the defendant has been represented by Max Pulliam, who is more than competent as an attorney to represent the defendant at his sentencing hearing currently set . . . ." Crim. ECF 32.

**C.    Hornbuckle has not made any showing of ineffective assistance because of an attorney conflict of interest (ground 8).**

Hornbuckle claims that Pulliam failed to disclose a conflict of interest because he had previously represented a person who had worked for Hornbuckle. Civ. ECF 1 at 17–18. But there was no conflict to disclose, and Hornbuckle identifies no possible impact the prior representation could have had on his case.

Hornbuckle identifies no conflict. In 2020, Pulliam represented Brett Taft in connection with charges that Taft conspired with a doctor and a pharmacist to commit prescription drug fraud. *See* Information, Doc. 1, *United States v. Taft*, 2:20-cr-414-ACA (N.D. Ala. filed Dec. 23, 2020). Contrary to Mr. Hornbuckle's statement, Civ. ECF 1 at 17, that case did not involve "related allegations." The case had nothing to do with QBR, Hornbuckle, or nerve conduction testing.

Hornbuckle also identifies no impact the prior representation could have had on Pulliam's representation of Hornbuckle. Pulliam's representation of Taft did not concern QBR or Hornbuckle or nerve conduction testing. Ex. 1 at 5. Pulliam does not recall "ever knowing or learning that Mr. Taft did work for Mr. Hornbuckle," and it "was not an issue that arose in [Pulliam's] representation" of Hornbuckle or his prior representation of Taft. *Id.* Hornbuckle does not identify any way in which the outcome of his case would have been different had Pulliam not represented Taft in a prior proceeding on unrelated conduct.

26

**D.    Hornbuckle has not made any showing of ineffective assistance at sentencing (ground 7).**

Hornbuckle complains that his lawyers reviewed the pre-sentence investigation report with him only "briefly." Civ. ECF 1 at 17. But he told the Court at sentencing that he had had sufficient time—35 days—to review the presentence report with his counsel. Crim. ECF 57 at 4. Hornbuckle also does not identify any prejudice—any issue in the presentence report that should been but was not corrected or objected to because he had inadequate time to review it.

Hornbuckle also faults Pulliam for not convincing the Court to forgo the organizer/leader enhancement. Civ. ECF 1 at 15–16. But Pulliam did object to the enhancement. *See* Crim. ECF 33 (four-page brief advocating against enhancement); Crim. ECF 57 at 4–25 (counsel reiterating objection at sentencing and cross-examining government witness on evidence for enhancement). Hornbuckle received the enhancement not because of a failure of advocacy but because the government offered testimony and sixteen exhibits at sentencing that proved Hornbuckle's leadership role and extensive involvement in the fraud and kickback scheme. *See id.* (government witness testifying to Hornbuckle's role and admitting exhibits); Crim. ECF 38-1 (QBR organization chart with Hornbuckle at the top); Crim. ECF 38-2 at 2 (Hornbuckle biography listing many years of experience in health care); Crim. ECF 38-3 (email from Hornbuckle with Blue Cross Blue Shield guidance on nerve conduction study coverage); Crim. ECF 38-4 (email from Hornbuckle on amounts

QBR billed insurance for nerve conduction tests); Crim. ECF 38-8 (email from Hornbuckle ordering QBR tech to test patient who had no pain symptoms because testing "is at the discretion of the referring MD" QBR was paying to order the test); Crim. ECF 38-5 (when tech asked for a doctor order before conducting a test, Hornbuckle told her to "shut her mouth and do her job"); Crim. ECF 38-13 ($14,000 check from QBR to Murphy signed by John Hornbuckle); Crim. ECF 38-14 ($5,000 "charitable contribution" to Jennifer Murphy's foundation signed by John Hornbuckle); Crim. ECF 38-16 (pain clinic emailing Hornbuckle to ask for "payment," because the doctor "provided the patients for your company, and he wants to get paid for it").

Courts have rejected ineffective assistance claims even where counsel failed to make a meritorious objection to a sentencing enhancement. *See, e.g.*, *Diaz v. United States*, 799 F. App'x 685, 687–690 (11th Cir. Jan. 13, 2020) (even if it was an "error in judgment" not to raise issue, counsel's failure was not deficient because the issue was unsettled). Here, Hornbuckle's counsel vigorously made a meritless objection. Counsel can hardly be faulted for losing an argument that the evidence did not support.

## II.    Hornbuckle's coerced-plea claim (ground 9) fails.

Though Hornbuckle frames his motion exclusively in ineffective-assistance terms, in ground 9 he appears to make a separate substantive claim that his guilty

plea was the product of threat or coercion. To the extent Hornbuckle means to assert a coercion claim for reasons beyond his lawyers' purportedly ineffective assistance, that claim fails.

To start, the claim is procedurally defaulted because Hornbuckle did not raise—though he could have raised—the claim on direct appeal. *See Toepfer v. United States*, 518 F. App'x 834, 840–841 (11th Cir. 2013) (recognizing that, unlike ineffective-assistance claims, "due process challenges to the voluntariness of a plea decision [can be and] are routinely raised and decided on direct appeal" and are therefore "subject to the procedural default rule"). Hornbuckle has shown neither cause and prejudice, nor probable actual innocence, to excuse that procedural default. *See Lynn*, 365 F.3d at 1234–1235.

Hornbuckle's coercion claim would also fail on the merits, for reasons already explained: no plausible factual support and a record that convincingly rebuts it. *See supra* at 15–18.

### III.    Hornbuckle's actual innocence arguments (grounds 10 and 11) fail.

Hornbuckle argues his actual innocence at length. *See* Civ. ECF 1 at 22–35. But although actual innocence can serve to excuse procedural default, it is not itself a substantive claim that can supply a basis for collateral relief. *See Amodeo v. FCC Coleman-Low Warden*, 984 F.3d 992, 1002 (11th Cir. 2021) (a "freestanding claim

of actual innocence is . . . under our circuit precedent[] meritless in a collateral proceeding"). That by itself is reason enough to reject Hornbuckle's arguments.

Hornbuckle's claims would fail on the merits as well. The evidence of Hornbuckle's guilt already on record is overwhelming. As detailed above, testimony and documents offered during the Murphy trial exposed Hornbuckle's fraud and kickback scheme. Other co-conspirators confirmed the scheme in their plea agreements and at their plea hearings. Hornbuckle confirmed the scheme—and his intent to participate in it—in his plea agreement and at his plea hearing. And the government's evidence at sentencing, presented to establish Hornbuckle's role as an organizer and leader of the scheme, underscored his guilt.

In an effort to walk back his prior statements and the substantial other evidence of his guilt, Hornbuckle makes numerous false claims. For example, he says he was just a "lay person" who did not understand the regulatory framework for health care, Civ. ECF 1 at 27 n.13—even though Hornbuckle's own biography claimed he had many years of experience running health care companies, Crim. ECF 38-2. Hornbuckle professes ignorance about what testing would be medically necessary, Civ. ECF 1 at 30, even though Hornbuckle's emails reflect his knowledge of insurance rules on that topic, Crim. ECF 38-3. Hornbuckle says he had no role in patients' getting medically unnecessary tests, Civ. ECF 1 at 30, even though Hornbuckle said a tech should nerve-test a patient without pain symptoms and only

an ingrown toenail complaint, Crim. ECF 38-8. Hornbuckle claims he "did nothing

to drive up testing volume," Civ. ECF 1 at 30, even though he paid doctors more for

ordering more tests and he told subordinates to increase test volume, Crim. ECF 38-

10. Hornbuckle claims he did not know paying doctors per test was illegal, Civ. ECF

1 at 27–28, even though the contract he sent Murphy hid the way his payments to

Murphy worked, *see* Crim. ECF 38-12 at 3 (contract stating QBR would pay Murphy

$200 "per QBR hour," when in reality QBR paid Murphy a flat fee per test).

Hornbuckle's actual innocence claim cannot supply a basis for collateral

relief. Even if it could, it would easily fail given Hornbuckle's sworn statements,

Hornbuckle's own emails, and the plentiful other evidence of Hornbuckle's guilt.

## IV.   Hornbuckle's Thirteenth Amendment claim (ground 6) fails.

Hornbuckle asserts a Thirteenth Amendment violation. The Thirteenth

Amendment prohibits "slavery" and "involuntary servitude, except as a punishment

for crime whereof the party shall have been duly convicted." U.S. Const. amend.

XIII, § 1.

The argument is procedurally barred: Hornbuckle offers no reason he could

not have raised it on direct appeal.

The argument also lacks merit. So far as the government can tell, the claim

rests on the faulty premise that Hornbuckle's incarceration resulted from the

"extension of a civil business dispute" rather than federal crimes. Civ. ECF 1 at 15.

31

As discussed, Hornbuckle was charged and convicted of federal crimes for which there was overwhelming evidence. He admitted to those crimes in court—statements that "carry a strong presumption of verity" he cannot overcome with the "subsequent presentation of conclusory allegations." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Hornbuckle is now serving a custodial sentence consistent with the statutes he admitted to having violated. *See* 18 U.S.C. § 371 (up to five years' imprisonment for a violation); 18 U.S.C. § 1347 (up to ten years for a violation). There is no basis for a slavery claim.

## CONCLUSION

The Court should deny Hornbuckle's Section 2255 motion on the papers. No evidentiary hearing is required because Hornbuckle has failed to establish a predicate for such a hearing.  His claims are "patently frivolous," conclusory, and "affirmatively contradicted by the record." *Rosin*, 786 F.3d at 877; *see Lynn*, 365 F.3d at 1238–1239; *Griffith v. United States*, 871 F.3d 1321, 1329 (11th Cir. 2017).

Respectfully submitted,

PRIM F. ESCALONA
United States Attorney

*/s/ John B. Ward*
JOHN B. WARD
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that, on June 7, 2025, I filed this document via the CM/ECF system,

and also sent a copy of this document by mail to defendant John Hornbuckle at the

following address that appears in the CM/ECF system:

> John Hornbuckle
> Register Number 96094-509
> Pensacola Federal Prison Camp
> P.O. Box 3949
> Pensacola, FL 32516

*/s/John B. Ward*
JOHN B. WARD
Assistant United States Attorney

33