# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **JOHN HORNBUCKLE** <br><br> v. <br><br> **UNITED STATES OF AMERICA** | Civ. 5:24-cv-8006 <br> Crim. 22-cr-78 |

## AFFIDAVIT OF MAXWELL H. PULLIAM IN RESPONSE TO HORNBUCKLE'S SECTION 2255 MOTION

I, Maxwell H. Pulliam, have reviewed John Hornbuckle's Section 2255 motion (Civ. ECF 1) and now respond as follows:

1. I have practiced law in Alabama for more than thirty-nine years. I have represented countless criminal defendants, including in cases involving allegations of health care fraud and health care kickbacks.

2. I was retained to represent John Hornbuckle before his indictment, and I represented him through sentencing.

3. I competently investigated Mr. Hornbuckle's case and was prepared to defend Mr. Hornbuckle at trial.

4. I have reviewed my records of the representation. My records show that I devoted substantial time to Mr. Hornbuckle's case. My entries reflect that I had at least several dozen conferences, many by telephone and some in person, with Mr. Hornbuckle. Many of the conferences were at least several hours in length.

1

5. I also met with the government multiple times regarding the case, the evidence, important documents, and the government's theory of prosecution.

6. I reviewed the evidence—on my own, with the government, and with Mr. Hornbuckle. I spoke at length with Mr. Hornbuckle about witnesses expected to testify for the government, about the testimony they would be expected to provide, and about possible defense witnesses and the possible testimony they could provide. I reviewed the evidence with Mr. Hornbuckle in detail. To take one example, my records reflect a telephone call on August 16, 2022, and a six-hour in-person meeting on August 22, 2022, during which we discussed key witness statements, transcripts, and a damning video recording of Mr. Hornbuckle made by Brian Bowman (who had pleaded guilty to crimes related to his work with Mr. Hornbuckle).

7. I investigated the case and possible defenses. I met and spoke with Mr. Hornbuckle about possible defense witnesses, including witnesses he identified. I discussed with Mr. Hornbuckle in detail the relevance and admissibility (or not) of the testimony each witness could offer.

8. I answered Mr. Hornbuckle's communications—often in extended conferences by telephone or in person.

9. As trial approached, Mr. Hornbuckle said that he would like to bring on another lawyer. I welcomed the assistance. Mr. Hornbuckle hired Joshua Lowther,

and with Mr. Hornbuckle's blessing the two of us agreed to try the case together. Mr. Lowther and I immediately began working to prepare for trial.

10.   Nine days before trial, Mr. Hornbuckle sent an email asking Mr. Lowther and me to move to continue the trial date. We did not do so because we believed the motion would be a strategic mistake and would not succeed.

11.   Mr. Lowther and I discussed with Mr. Hornbuckle the trial, the strength of the government's evidence, and the inadmissibility of evidence he wished to offer. Mr. Hornbuckle was focused on a conspiratorial theory that his former business partner Chris McCutcheon, and McCutcheon's father Mac McCutcheon, were politically protected and out to get Mr. Hornbuckle. That defense did not appear to be relevant to Mr. Hornbuckle's own guilt or admissible at his trial. To be sure, in conversations with Mr. Hornbuckle I voiced support for his view to build credibility and trust, but I also explained that the defense would not be admissible and that the evidence against Mr. Hornbuckle was strong.

12.   Mr. Lowther and I also discussed with Mr. Hornbuckle the possibility of a resolution by guilty plea. We discussed with Mr. Hornbuckle the federal sentencing Guidelines and their possible application in Mr. Hornbuckle's case. We discussed the possibility that Mr. Hornbuckle could cooperate against other individuals and that, if Mr. Hornbuckle provided substantial assistance, the government could move for a downward departure at sentencing. But we did not

promise Mr. Hornbuckle that he would receive home confinement or any other particular sentence.

13.  Mr. Hornbuckle ultimately agreed to plead guilty. At the change-of-plea hearing, Mr. Hornbuckle stated under oath that he was guilty of the charges and that he was pleading guilty voluntarily and not because of threat or coercion. I believe that this was true. Mr. Lowther and I had extensive discussion with Mr. Hornbuckle about the plea agreement and the case. We did not threaten or coerce Mr. Hornbuckle to plead guilty.

14.  Mr. Hornbuckle's Section 2255 motion makes other assertions that are incorrect. For example, I do not believe Mr. Hornbuckle was terrified of the McCutcheons or fearful for his life. Mr. Hornbuckle was a large and physically imposing man. Indeed, during one meeting in my office conference room, he became so angry that he made a move as if to come across the table toward me, and I felt physically threatened.

15.  Although I have not listened to the audio recordings Mr. Hornbuckle refers to in his motion, I know that I never seriously suggested to Mr. Hornbuckle that he would be murdered if he took the case to trial, or that he had to plead guilty despite his innocence because the system was rigged against him. To the contrary, I advised Mr. Hornbuckle that the evidence against him was strong.

16. Mr. Hornbuckle asserts that he was brutally attacked by a group of masked men in August 2021, and that he discovered a bomb attached to his car in August 2020. I do not recall Mr. Hornbuckle's ever mentioning these events to me. I have no reason to believe that his claims are true.

17. Mr. Hornbuckle asserts that it was a conflict of interest for me to represent Mr. Hornbuckle after having previously represented Brett Taft, because Mr. Taft had once done work for Mr. Hornbuckle. I am not aware of any conflict. In 2020, I represented Mr. Taft in a criminal case charging conspiracy to generate fraudulent and medically unnecessary prescriptions for compounded drugs. *See* Information, Doc. 1, *United States v. Taft*, 2:20-cr-414-ACA (N.D. Ala. filed Dec. 23, 2020). That case did not involve any allegations related to QBR, Mr. Hornbuckle, or nerve conduction testing. I do not recall ever knowing or learning that Mr. Taft did work for Mr. Hornbuckle. If he did, it was not an issue that arose in my representation of Mr. Taft or that affected my representation of Mr. Hornbuckle.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 6, 2025.

_____
MAXWELL H. PULLIAM