# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **JOHN HORNBUCKLE** <br><br> v. <br><br> **UNITED STATES OF AMERICA** | **Civil No. 5:24-CV-08006** <br> **Criminal No. 5:22-CR-00078** |

## DECLARATION OF JOSHUA SABERT LOWTHER IN RESPONSE TO JOHN HORNBUCKLE'S SECTION 2255 MOTION

I, Joshua Sabert Lowther, have reviewed Mr. Hornbuckle's motion pursuant to 28 U.S.C. § 2255 (Civ. ECF 1) and respond as follows:

1. Mr. Hornbuckle retained me to represent him in October 2022, weeks before his November 7, 2022, trial was set to begin.

2. My communications with Mr. Hornbuckle began when he contacted me in August 2022. Mr. Hornbuckle advised me that he was dissatisfied with his then-current attorney Maxwell Pulliam; that Mr. Pulliam had advised him to retain another attorney; and that Mr. Hornbuckle wanted me to represent him. I had several lengthy telephone conversations with Mr. Hornbuckle about his case.

3. Mr. Hornbuckle then met with me in my office in Atlanta, Georgia, and we further discussed the case at length. Mr. Hornbuckle's focus was on blaming Mr. Chris McCutcheon (with whom Mr. Hornbuckle had founded a

1

company, QBR, LLC) and Mr. Mac McCutcheon (Mr. Chris McCutcheon's father). Mr. Hornbuckle and I reviewed the Indictment, and I explained to Mr. Hornbuckle the elements of the offenses that the Government would have to prove at trial.

4.   I agreed to represent Mr. Hornbuckle for a $250,000 retainer. Mr. Hornbuckle made an initial payment of $100,000 toward that retainer.

5.   I did not assure Mr. Hornbuckle that the Court would grant a continuance of trial. I contacted the lead prosecutor, Assistant United States Attorney John B. Ward, and discussed with Mr. Ward whether a continuance would be possible. Mr. Ward advised me that he did not expect that the Court would continue the case so close to trial, although he obviously could not speak for the Court.

6.   I also discussed the matter with Mr. Pulliam, whom I had not met previously. Mr. Pulliam advised me that he had not directed Mr. Hornbuckle to retain another lawyer, but rather that if Mr. Hornbuckle wanted a second opinion or substitute counsel, he was free to seek and retain an attorney for either purpose. Mr. Pulliam also advised me that he did not expect that the district judge would be willing to continue the trial, but that he would be willing to work with me as co-counsel on the case. Mr. Pulliam further agreed that he would assist me in any way necessary to become familiar with the evidence. Mr. Pulliam and I agreed that we would divide the tasks that

needed to be accomplished before trial, and that we would discuss and agree on our respective roles during the forthcoming trial.

7. I then discussed that proposition with Mr. Hornbuckle. I explained that I would be willing to participate in the trial of the case as Mr. Pulliam's co-counsel, but if Mr. Hornbuckle did not agree with that arrangement, I would refund the $100,000 payment that he had made. Mr. Hornbuckle declined the offer for a refund and confirmed that he wanted both Mr. Pulliam and me to represent him.

8. I immediately began working with Mr. Pulliam to prepare for trial. Within a few days of trial preparation, it became readily apparent that Mr. Hornbuckle had no viable defense. Mr. Hornbuckle was focused on a conspiratorial theory that the aforementioned McCutcheons were plotting against him—a defense that did not appear to be relevant to his own guilt or admissible at his trial.

9. Mr. Pulliam and I had extended discussions with Mr. Hornbuckle about his proceeding to trial, the expected evidence, and the inadmissibility of evidence that Mr. Hornbuckle wanted to present. Mr. Pulliam and I further discussed with Mr. Hornbuckle the strength of the evidence against him and the specific items of evidence of his guilt that the Government would admit into the record at trial.

10. Mr. Hornbuckle, Mr. Pulliam, and I then discussed the possibility of a resolution by plea agreement. I, with Mr. Hornbuckle's permission, asked the Government for a proposed plea agreement. Mr. Ward and I discussed the sentencing guidelines that we thought would be applicable to the plea agreement; I reviewed those sentencing guidelines calculations myself, then with Mr. Pulliam, and then with Mr. Hornbuckle. I did not promise Mr. Hornbuckle that he would be eligible for the Safety Valve (which is not even applicable to a non-Title 21 offense), or that the Court would sentencing him to a term of home-confinement (or any other non-custodial sentence). Mr. Hornbuckle and I, at various times both with and without the participation of Mr. Pulliam, discussed the possibility that Mr. Hornbuckle could cooperate against other individuals and that, if Mr. Hornbuckle provided substantial assistance to the Government, that it could move the Court for a downward departure at sentencing.

11. Mr. Hornbuckle ultimately agreed to plead guilty. The day before the change-of-plea hearing, and again the morning of the hearing, I spoke at great length with Mr. Hornbuckle, both with and without the participation of Mr. Pulliam, about the plea agreement, the change-of-plea hearing, sentencing, and cooperation with the Government.

12. At the change-of-plea hearing, Mr. Hornbuckle stated under oath that he was guilty of the charges and that he was pleading guilty voluntarily and

4

not because of threat or coercion. I believe that this was true. Mr. Pulliam and I had extensive discussions with Mr. Hornbuckle about the plea agreement and the case. I never threatened Mr. Hornbuckle in any way, nor did I ever observe Mr. Pulliam threaten Mr. Hornbuckle in any way.

13. Mr. Hornbuckle's habeas-corpus motion makes several other assertions that are incorrect. For example, Mr. Hornbuckle asserts that Mr. Pulliam was completely unprepared to go to trial. My impression from working with Mr. Pulliam was exactly the opposite. Mr. Pulliam appeared to have studied the discovery in detail; he had multiple discussions with the Government about the evidence and the witnesses; and he had discussions with Mr. Hornbuckle about the same. There was no question that I asked Mr. Pulliam about the evidence or witnesses that he could not readily answer, and there was no item of discovery for which I asked Mr. Pulliam that he could not readily produce.

14. Mr. Hornbuckle further asserts that he had been brutally attacked by a group of masked men in August 2021, and describes having discovered a bomb attached to his car in August 2020. I do not recall Mr. Hornbuckle's ever mentioning these events to me, and I have no reason to believe, based on my knowledge of this case (or otherwise) that those assertions are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 9, 2024.

_____

Joshua Sabert Lowther