FILED

2025 Jul-14  PM 02:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**



**JOHN HORNBUCKLE**

**Petitioner,**

**v.**

                                         **Civ. 5:24-cv-8006-LCB**
                                         **Crim. 22-cr-78-LCB**

**UNITED STATES OF AMERICA,**

**Respondent,**

**HORNBUCKLE'S RESPONSE TO UNITED STATES' MOTION**

**TO DENY SECTION 2255 MOTION**

Comes now petitioner JOHN HORNBUCKLE, pro se, to submit subsequent

evidence, to rebut, to correct errors, and assumptions made by the UNITED STATES

OF AMERICA through its agent JOHN B. WARD, for clarity of the record.

1. When Hornbuckle first met with Maxwell H. Pulliam and later with Joshua Lowther, it was Pulliam's assertion that Hornbuckle's defense should be simple. It was only after speaking with the DOJ did Pulliam's interest in preparing a defense for Hornbuckle become absent. He only spoke of sentencing guidelines and persisted in coercing Hornbuckle into taking a plea. Hornbuckle upon seeing no efforts to prepare a defense, at the suggestion of Pulliam, with the trial date fast approaching hired Josh Lowther, who also initially expressed his opinion of how simple it would be to defend Hornbuckle. It was agreed that Lowther was to relieve Pulliam of his duty and take over the case. Upon contacting Pulliam, Lowther reversed his position of replacing Pulliam and preparing a defense. He instead joined Pulliam in coercing Hornbuckle to take a plea. These efforts increased tremendously just five days before the trial date, where Hornbuckle maintained his innocence and wished to proceed with the trial. As the evidence submitted of conversations between Pulliam and Hornbuckle shows that even though Pulliam was advising Hornbuckle to plea he still maintained the position that Hornbuckle had been railroaded, set up and was innocent.

2. It begs to question why Pulliam would abandon his contractual duty as representative of Hornbuckle to produce evidence and defend him as he failed to do so or even make an attempt. It begs to question why Pulliam would jeopardize his career and reputation by violating ethics and 42 U.S.C. Section 12203 by coercing Hornbuckle, knowing he was innocent with threats of being retaliated against by ending up in the river. It begs to question why after speaking to the DOJ and Judge Scott Coogler who in Pulliam's words "was well connected, that the fix was in and it was political" Pulliam would not challenge the unethical violation of Hornbuckle's right to due process. It begs to question why

Pulliam would go to the extent of coercing Hornbuckle under extreme duress by alleging that he would be murdered and put into the river. It begs to question why Pulliam would violate his duty as an officer of the court or violate his contractual obligation to Hornbuckle by not exposing or at least challenging wrongdoing which would violate Hornbuckle's right to due process. It begs to question why Pulliam would advise Hornbuckle to take an unconstitutional, violation of his fifth amendment, unlawful plea. Where Lowther informed Hornbuckle that Judge Scott Coogler said if he pleas, the sentencing guidelines to be used arrive from a $9 million case, but if he takes it to trial, Coogler will apply the more severe sentencing guidelines associated with the $59 million case, this is a violation of due process, coercion and retaliation (42 U.S.C Sec. 12203), or coercion from Lowther at best.

3.  If in fact, the assertions made by Pulliam are correct, that Hornbuckle was railroaded, set up, and innocent, it is his duty as an officer of the court to take action to expose the fraud perpetrated in violation of due process. It is Hornbuckle's position to assert at the discretion of the court to investigate and bring to justice if it sees fit, any malfeasance perpetrated in this matter. It is not, Hornbuckle's position to motion for the court to exact justice within the district court system. He leaves that to the court itself. However, it is Hornbuckle's position to make a motion to grant his Section 2255, on the grounds of ineffective assistance of counsel, the deprivation of rights under the color of law 18 U.S.C. section 241 and 242 as well as the constitutional violation as one of God's created beings, with unalienable rights guaranteed by the constitution under his fifth and sixth amendment rights to exact due process, to clear his record and his name, to be exonerated and receive restitution for every day he spent unlawfully imprisoned, in violation of the 13th Amendment.

4. The government citing, relying on, and attempting to enter into the record, testimony taken in the Murphy case is conjecture and hearsay at best. It is as inadmissible as it is irrelevant and unsubstantiated. Ward is trying to use alleged testimony he intended to use as evidence against Hornbuckle, if it had gone to trial as if it were fact. This is yet another attempt to deny Hornbuckle due process. It is irrelevant as it does not pertain to this 2255 action, because Hornbuckle's right to a trial by a jury of his peers was subverted. In some instances, these testimonies were taken from witnesses who were in plea negotiations with the government themselves. It stands to reason that such persons were under pressure from the government, just as Hornbuckle was placed, to cooperate in strengthening the government's case by testifying against defendants in other cases in exchange for considerations in accordance with their plea deal **(SEE EXHIBIT A & B).** These so-called testimonies aren't evidence against and cannot be treated as such, because Hornbuckle had no opportunity to produce rebuttal evidence or cross examine. Therefore, it is inadmissible and should be stricken from the record. Allegations are not facts.  The government is attempting to try this case out of the court room to assign guilt. As if the evidence it had intended to use, had it gone to trial, alleviates or justifies the improper manner in which Hornbuckle's plea was obtained.  It is significant to state for the record that Hornbuckle sat in silence at his March 2023 sentencing hearing without a single objection from attorney Pulliam. At this hearing the FBI agent provided possible perjured testimony which could be viewed as subornation of perjury. **Hornbuckle Motions this Honorable Court to provide the sentencing hearing transcripts as additional evidence**.

5.  This 2255 motion is challenging the manner in which the government obtained
    Hornbuckle's plea, which Hornbuckle was denied due process by the ineffective
    assistance from counsel as well as being coerced under extreme duress by threats on his
    life and the assertions from his lawyers that the fix was in, it was political, and he could not
    receive a fair trial, only five days from his trial date, in a **miscarriage of justice**.

6.  The government cites Hornbuckle's voluntary participation to plea, however if taken under
    duress invoked by threats, plea must be handled as if it never existed and Ward knows this.
    Hornbuckle could not take issue with the case on direct appeal because Hornbuckle
    understood that waving the right to appeal is part of the plea process. If this were not true,
    Hornbuckle's attorneys should have informed him. This is yet another example of the
    ineffective assistance of counsel. HORNBUCKLE HAD NO KNOWLEADGE OF THE APPEAL
    PROCESS OR THE IMPLICATIONS OF A PLEA. HORNBUCKLE DRAFTED A PLEA
    WITHDRAWAL PRIOR TO SENTENCING AFTER THE 1819 NEWS ARTICLES WERE
    PUBLISHED, **(SEE EXHIBIT C)** BUT WAS NOT SOPHISITCATED ENOUGH OR EXPERIENCED
    ENOUGH TO NAVIGATE THIS PROCESS WITHOUT AN ATTORNEY AND WITHOUT
    FINANCIAL RESOURCES AT THE TIME WITH LIMITED TIME TO CIRCLE THE WAGONS.

7.  The manner in which the government downplays, as hyperbole, the evidence submitted
    **(SEE DOC 17 EXHIBITS A and D)** where Pulliam tells Hornbuckle he'll end up in the GD
    river clearly shows its insensitivity, prejudice, and intent to dismiss a man being placed
    under duress. It's clear that justice is not of interest. The video taken by Bowman, the video
    the government cites as damning, Hornbuckle is convinced exonerates him. The so-called
    kickbacks the government presents are not kickbacks but were payment for services as

outlined in Hornbuckle's Professional Service Agreement **(SEE DOCUMENT 1 EXHIBIT D).**
By using the Regulatory Analysis, the original PSA agreement was EDITED in 2012 by CFO
McCutcheon and an attorney which was presented to the Attorney General at the time
Luther Strange. Hornbuckle has email evidence of the fact that McCutcheon claimed the
PSA was approved by AG Luther Strange and was socialized **(SEE EXHIBIT G).** Hornbuckle
has exceptions to hearsay, email evidence and future affidavits to be executed to confirm
these facts. In Q4 2014 Hornbuckle would later have Healthcare Attorney Clark
Pendergrass of Lanier Ford edit the PSA. Hornbuckle demonstrated due diligence and
compliance at all junctures to ensure being compliant and can prove this. A continuation
of the framing of Hornbuckle was ongoing by the whistleblowing CFO Chris McCutcheon
who is to this day pursuing a $99MM USD Bounty against Hornbuckle through a Fraudulent
False Claim Act "Qui Tam" where he personally orchestrated the framing with his attorney
Bartley Loftin who bartered the Qui Tam with Battle and Winn in exchange to "release" a
Compass Laboratories "Qui Tam". Compass Laboratories previously owned by Brian
Bowman is now owned by Bartley Loftin. This is just like the 1997 John Grisham Novel "The
Partner", it is the exact playbook. Bartley Loftin met with Hornbuckle in 2015 to discuss the
McCutcheon challenges at Bradley Arrant Law firm in Huntsville Alabama, then Bartley
leverages this meeting to go around Hornbuckle and represent Hornbuckle's business
partner at the time CFO Chris McCutcheon. Then files a civil complaint against Hornbuckle
that he was pushing CFO McCutcheon out leveraging a settlement agreement which was
signed on March 24th, 2017. That same day March 24th, 2017, a fraudulent False Claim Act
Qui Tam was filed under seal and where the US Attorney Jay Town executed a subpoena in
January 2018, just 2 weeks after the final settlement agreement was paid through Bradley
Arrant Law firm and Baker Donelson. This agreement drafted by Attorneys... and approved

by then Alabama Attorney General Luther Strange shows Hornbuckle's intent to make sure his business is not acting illegally. This is supported under the requisite *mens rea* requirement to convict. This is yet further evidence of the ineffective assistance of counsel (42 U.S.C. §§ 1320a-7b(b)(1) and (b)(2)).

8.  The government fails to mention in its motion to deny, Pulliam's assertion that the fix is in with the judge and it is political, brings to question the Murphy case **(SEE DOC 17 EXHIBITS B and D)**. The government disregards and fails to mention Pulliam's assertion that Hornbuckle was set up and railroaded from day one, in an admission of Hornbuckle's innocence. The inclusion of a titled affidavit from Pulliam and the Declaration from Lowther, Hornbuckle's attorneys working in concert with the government to further conceal their collusion to deny Hornbuckle due process, as guaranteed by the Constitution is evident. The government cherry picks which of Pulliam's comments **(SEE DOC 17 EXHIBITS A, B, C, and D)** it considers hyperbole and ignores Pulliam's comments about the district court judge being well connected, it is political, and you'll end up in the GD river as well as his comment concerning the efforts of Brian Bowman, who tried to enter evidence, relating to Christopher and Chester "Mac" McCutcheon, in the Murphy trial, stating Judge Coogler shut that ass down. This was another effort to discourage Hornbuckle from proceeding to trial. These comments from Pulliam, as an agent of the court, were understood to be very sincere, threatening, and frightening, because he was referring to very powerful and influential men. Add to that Hornbuckle's past attacks, that Pulliam was aware of, Pulliam knew very well how Hornbuckle would perceive it, and that's exactly why he said what he did. He knew, by his own words, that Hornbuckle was innocent, this was calculated and intentional effort to get a plea from Hornbuckle.

9.  Pulliam's titled affidavit account of events relating to Lowther are inaccurate, Pulliam tells Hornbuckle if you're not happy with my representation maybe you'd like a different attorney, Hornbuckle responds with it's interesting that you would say that. The ineffectiveness of Pulliam's representation is evident as he doesn't challenge the accusations of so-called evidence the government relies on but accepts it as fact. Pulliam acknowledges Hornbuckle's position of the conspiratorial nature of the political powers at work with the McCutcheons as Pulliam states the fix is in and it is political. Chester "Mac" McCutcheon being Speaker of the House for the STATE OF ALABAMA. Pulliam's statements in the recording affirm Hornbuckle's stance of political powers at work with the government and Pulliam dismisses Hornbuckle's concerns and passes them off as conspiracy, and the fact that Judge Coogler would disallow any evidence to be presented relating to McCutcheon. If he was convinced of that fact, he should have at least motioned for Hornbuckle's trial be reassigned to another judge, for prejudice. The acknowledgement of a "public official's conduct" is confirmed with Pulliam as well as the government noted in Pulliam's letter to Hornbuckle date August 9th, 2022 **(SEE EXHIBIT B).**

10. The number of people who have stepped down or retired is interesting. US attorney Jay Towne initiated and signed the subpoena for QBR LLC in January 2018, approximately 2 weeks after the final settlement agreement was paid to CFO Chris McCutcheon by Hornbuckle. Hornbuckle cooperated through his firm at the time Baker Donelson to follow his commitments. Towne stepped down, Bartley Loftin leaves Bradley Arrant, Chester Clarence "Mac" McCutcheon didn't seek reelection as Speaker of the House of Alabama, and District Court Judge Scott Coogler retired, before Hornbuckle's 28 U.S.C. Section 2255

motion was responded to 10 months after his filing it. It was only after Judge Liles Burke was assigned to the 28 U.S.C. section 2255 did Hornbuckle see any movement.

11. The statement from Judge Coogler the government cites, stating you're in enough trouble don't add perjury to it, is very interesting. It begs to question had Judge Coogler seen the evidence that the government intended to use against Hornbuckle, in some ex-parte meeting with the government or was he resting on his recollection of evidence presented in another case nearly a year before. It certainly seems to affirm Judge Coogler's predetermination of Hornbuckle's verdict, long before the trial date. This is a statement to intimidate Hornbuckle from challenging his plea in a future action, such as an appeal. Pulliam had conveyed to Hornbuckle the Bowman video used in the Murphy case; the judge asks is your man in the video. The video that the government planned to use against Hornbuckle, the video Hornbuckle is convinced exonerates him. It appears that Judge Coogler was already convinced of Hornbuckle's guilt from his recollection of evidence used in another case. Again, Hornbuckle was denied an opportunity to cross-examine and Judge Coogler was convinced of Hornbuckle's guilt before any evidence was presented against him. This is more evidence of the fact that Hornbuckle could not receive a fair trial from an impartial judge. In most federal cases, the Judge is not even allowed to share a hallway with the prosecution but, in Hornbuckle's case evidence is openly discussed and threats are made through Hornbuckle's attorney as well as the Judge which included the Judge threatening to place Hornbuckle in a holding facility if he did not respond to Pulliam in a timely fashion, and this was when Hornbuckle's mother had suffered a severe stroke where her health declined drastically.

12. It's important to note that Pulliam's titled affidavit bears no notary, nor Lowther's declaration, Lowther didn't bother to draft an affidavit, as the government states. Surely, a white-collared attorney, such as Lowther and a self-proclaimed highly accomplished criminal trial lawyer with nearly 40 years' experience as Pulliam understands that an affidavit which bears no notary seal and signature, an unnotarized affidavit is treated as a simple statement with no special legal weight. It is legally invalid, so it should be treated as just more hyperbole from Mr. Pulliam, he is misleading the court. Neither Pulliam nor Lowther were served in this 28 U.S.C. section 2255 action from Hornbuckle, nor are they a party to it, however they may become witnesses in a future evidentiary hearing. Pulliam states he hasn't heard the evidence, which is electronic, but is defending his statements. This is proof that the government solicited Pulliam and Lowther's statements which is further evidence of their collusion to defraud Hornbuckle. This strategy is calculated and misleading, to undermine, discredit and conceal their willful, suggestive, coercion in Hornbuckle's case, threatening his life and his ability to receive a fair trial. Again, Ward, Pulliam, and Lowther are attempting to try Hornbuckle in this action using unsubstantiated allegations instead of addressing the facts presented by Hornbuckle, challenging the manner in which his plea was obtained. Again, all material the government intended to use, had Hornbuckle gone to trial, is unsubstantiated and irrelevant at this juncture.

13. Included in Hornbuckle's original 28 U.S.C. section 2255 filing are many facts where the government and Ward are unresponsive. Ward cherry picked certain comments from Pulliam then speculates he knows what Pulliam meant when he said it, then ignores other statements. The Professional Service Agreement, the FACT that Nerve Conduction and

Somatosensory Evoked Potential Diagnostics are not DESIGNATED HEALTHCARE SERVICES and are not even subject to Self-Referral Anti-Kickback Laws. The government is misapplying laws to Services that do not fall under those statutes § 1395nn(b)(1) and (2)(A)(i) exceptions to prohibited arrangements apply both to Stark Act prohibitions and the Anti-Kickback Act prohibitions. This is explained in detail in the 28 U.S.C. Section 2255 original filing **(SEE EXHIBIT E, Regulatory Analysis of Proposed Mobile IDTF Arrangement). Hornbuckle makes motion that the prosecution provide a letter of recommendation from the OIG and Solicitor General to substantiate the conspiracy charges of paying and receiving kickbacks under anti-kickback statutes to confirm subject matter jurisdiction of the prosecution and court.**

14.    The government speculates that it knows Pulliam and Lowther's opinion that they felt Hornbuckle didn't have a viable defense. Again, ignoring Pulliam's assertions that Hornbuckle was set up and railroaded, presented in the audio evidence **(SEE DOC. 17 EXHIBITS B & D).**

15. The government fails to address Hornbuckle's 2255 filing asserting the McCutcheon involvement and Pulliam's subsequent statements of the fix being in, with the judge and it was political, this is a critical and extremely relevant component to the plea coercion. In the government's response concerning the audio evidence relating to the McCutcheons, Ward speculates Pulliam is going along with Hornbuckle to build credibility. This is mere speculation, Ward can't be sure of Pulliam's intentions. This is concerning and yet further evidence of Pulliam's ineffectiveness, as the government is acknowledging the fact

that Pulliam is intentionally lying to Hornbuckle in an attempt to gain credibility and

trust. This is a very disingenuous, unpropitious manner of gaining trust. The government has

verified the fact that Pulliam is manipulative. Which stands to reason that it's not beyond

Pulliam to say whatever, to mislead Hornbuckle, including coercion.  What the

government dismisses as conspiracy concerning the McCutcheons is unsupported. The

involvment of the McCuthceons is supported by 1819 news articles **(SEE EXHIBIT C, links**

**to 1819 news stories)**. The government avoids acknowledging their "SELECTIVE

PROSECUTION" of Hornbuckle and the unclean hands of Chris McCutcheon with a

Fraudulent FCA Qui Tam.


16. The government relies on the record concerning Hornbuckle's plea agreement, this

    rationale fails because Hornbuckle was under extreme duress. The government cites

    *Winthrop-Redin* claiming Hornbuckle *waited long after pleading "and only after all other*

    *avenues for relief from his sentence were exhausted, to say anything to the district court*

    *about alleged threats".* This argument fails on the grounds of just as Hornbuckle has

    produced in his evidence, collusion between his attorneys, the government, and a judge

    who is well connected politically. It was Hornbuckle's belief, supported by evidence that the

    fix was in, even though Pulliam believed Hornbuckle was innocent he could not get a

    fair trial from an impartial judge. This is further evidence of the duress Hornbuckle was

    under, being left with no other option. However, after the fog of duress lifted, Hornbuckle

sought remedy and justice with the only instrument provided to him, a 28 U.S.C. section 2255 motion. The government states (page 15, DOC.16) the affidavits from Hornbuckle's lawyers confirm Hornbuckle pleaded guilty knowingly and voluntarily, after informed, well-counseled, deliberation. This well-counseled deliberation was nothing more than high-pressure tactics on the part of Hornbuckle's lawyers after Hornbuckle informed them he had decided to proceed with trial and not take a plea.

17. The government continues to speculate it knows what Pulliam meant by his comment "Ending up in the river" calling it a hyperbolic metaphor. Ward can't possibly know Pulliam's intended meaning, unless he's clairvoyant. The government refers to the recorded evidence as edited and brief and lacks context, yet has enough context to arrive at the conclusion of its hyperbolic theory.  The reason for brevity is to not burden the court with long recordings and only submitting relevant audio, however, with the additional evidence presented, Hornbuckle feels assured the audios show full well the context. Hornbuckle feels assured that the audios clearly demonstrate plenty of context. But to give additional context for the Government, attorney Pulliam expressed to Hornbuckle that he knew firsthand of the corruption with attorney Bartley Loftin and his relationship with former US Attorney Jay Town. He began to verbally express that his friend attorney Joseph Espy III had been made an offer to get rid of the Bowman indictment, in the form of a bribe of monetary payment. Hornbuckle has emails between attorneys acknowledging the potential federal crimes. At these moments, Hornbuckle did not know if this was yet

another baiting or framing to entice Hornbuckle to offer to buy his indictment, but

Hornbuckle could not believe what he was hearing. It was at this point when he began

attempting to record some of their meetings and to Hornbuckle's surprise Pulliam began

threatening Hornbuckle with being murdered. Pulliam elaborated on the conflicted Judge.

Pulliam also elaborated on the Espy narrative and expressed that Jay Towne or his people

may put Loftin in a river as well which is plain as day in the audio, and other than terrifying

Hornbuckle, it would be far-fetched for anyone to believe that Pulliam would share such

details in the form of a lie to gain additional "trust" from Hornbuckle. This is absurd to even

suggest and should be investigated by a third party. Evidentially, Mr. Espy has integrity and

he separated himself from the corruption, but the audios don't lie. No one would conclude

Pulliam would lie about someone else's case involving a US Attorney, his attorney friend

Bartley Loftin and The McCutcheons who Bartley Loftin represented in a civil case and is

also, close friends with US Attorney Jay Towne. It is no secret in legal & political circles in

Birmingham Alabama that The False Claim Act "Qui Tam" was orchestrated by Jay Towne,

Bartley Loftin, and the McCutcheons to act as a cover up, method to prosecute and a

financial bounty to completely destroy their targets. In the name of public trust and the

integrity of the justice system prayerfully, Hornbuckle asks the courts to raise the standard

of review to explore civil rights violations under the color of law and exploit how lawfare is

injecting politics into our judicial system and how FCA Qui Tams are being used to

neutralize targets to acquire their successful companies. The DOJ accepted a fraudulent

False Claim Act Qui Tam which demonstrates selective prosecution.

18. The government claims Hornbuckle's allegations are too conclusory to evaluate. His claims

    are plainly stated, supported with substantial evidence he was coerced under extreme

    duress with threats of being put into the river and that the fix was in with a politically

    connected impartial judge, let alone the now evident concerted effort from the government

    and his defense attorneys to deny due process. Arguing Hornbuckle's evidence with

    contradictions, hyperbolic theories, omissions, avoidances, mind-reading, manipulation to

    build credibility and trust.  The government responds concerning Pulliam's labeled,

    unnotarized, affidavit which is nothing more than a simple statement, that he advised

    Hornbuckle about the consequences of a guilty plea. However, in fact told Hornbuckle that

    the court is aware of his situation as the primary caretaker of his then 90-year-old mother,

    and if he cooperated with the government and gave them useful information about other

    defendants that he could get as little as 11 months home confinement. Maybe this was just

    another of Pulliam's efforts to lie to Hornbuckle, to gain more trust and credibility.


19. The government states (page 22 of the government's motion to deny DOC. 16) that Pulliam

    has no absolute duty, to investigate particular facts or a certain line of defense. However,

    unless the defense attorney investigates the evidence and potential witnesses, submitted

    by the one with the most knowledge of the case, the one paying for services, whom he has a

    contract with Hornbuckle, it begs to question how he can be confident that it would not be

    beneficial, unless he, in his own words knew that "the fix was in". This is all consistent with

Pulliam's actions. Comments made by Pulliam would lead a person to believe he was also threatened. Evidence will be socialized to the docket that attorney Bartley Loftin had Pulliam's firm contacted to extend and offer business referrals. All captured on audio evidence but according to the government this is an imagined story designed to win Hornbuckle over. This is the very definition of Ineffective Assistance of Counsel.

20. Hornbuckle's assertion that Chris McCutcheon was being protected and had an interest in Hornbuckle's conviction to advance McCutcheon's civil suit is consistent, as McCutcheon, in fact has sued Hornbuckle in a $99 million civil suit **(Case # 5:17-cv-0462-MHH) (SEE GROUND FIVE AND SIX submitted in original 2255 filing DOC 1 and SEE EXHIBIT D)**. That Chris McCutcheon pumped and dumped the company **(SEE EXHIBIT C 1891 News Articles)** and was not only being protected but orchestrated a Fraudulent False Claim Act "Qui Tam" to serve as a coverup and an instrument to dispatch FBI assets through the direction of the DOJ to leverage conspiracy sentences. Also, the Qui Tam served as a bounty to extort defendants of their assets and livelihoods.

21. The government alleges damning evidence from Mark Murphy where he states that payments from QBR motivated him to order more tests. This may imply Mark Murphy's greediness, but in no way implicates Hornbuckle. Examination rooms were dedicated to the services at specific time durations and some in-house ancillary services have an economic proposition. QBR made payments in accordance with Hornbuckle's Professional Service Agreement **(SEE DOC. 1 EXHIBIT D)**.

22. Failure to move for a continuance. This assertion from Hornbuckle is in alignment with the reason Lowther was brought on board. Pulliam had not interviewed witnesses or made himself familiar with evidence Hornbuckle wished to use, the trial date was fast approaching and Hornbuckle felt his attorney was not prepared. By the time Lowther was to take over the case, he would not have ample time to prepare for trial. Lowther was to replace Pulliam and represent Hornbuckle at trial. Lowther needed a continuance to prepare, he assured Hornbuckle he would file for a continuance on those grounds, but failed to do so and instead joined Pulliam **(SEE EXHIBIT F AND SEE EXHIBIT B continuance email submitted in original 2255 filing DOC 1)**. It is Hornbuckle's belief that this is where Pulliam informed Lowther of the fix being in, so no efforts to prepare for trial were necessary. A continuance of the trial date was never requested. Neither Pulliam nor Lowther even responded to Hornbuckle's email. Lowther did not even attend the sentencing hearing as Hornbuckle sat in silence with Pulliam as perjured testimony was provided and not a single objection was made adding years to Hornbuckle sentence. A continuance requested by Lowther for sentencing was denied by the court noting "*in all the proceedings of this case, the defendant has been represented by Max Pulliam, who is more than competent as an attorney to represent the defendant at his sentencing hearing currently set . . . .*" *Crim. ECF 32*. This is the very definition of prejudice.

23. The government states (page 29 DOC. 16**)** Hornbuckle's coercion claim is procedurally defaulted because he did not bring it up on direct appeal. Hornbuckle is not an attorney and

would have no knowledge of any procedural default rule. He surely could not address it with

his defense attorneys. This argument fails as it is removed from intellectual reasoning.

24.  The government states Hornbuckle argues his actual innocence at length. *See Civ. ECF 1 at*

*22–35. But although actual innocence can serve to excuse procedural default, it is not itself*

*a substantive claim that can supply a basis for collateral relief.* **Is justice of no interest?**

*United States Supreme Court repeatedly has observed that "no procedural device for the*

*taking of guilty pleas is so perfect in design and exercise as to warrant a per se rule*

*rendering it 'uniformly invulnerable to subsequent challenge.'" Blackledge v. Allison, 431*

*U.S. 63, 73 (1977), quoting from Fontaine v. United States, 411 U.S. 213 (1973); See also,*

*Machibroda v. United States, 368 U.S. 487 (1962).  As the Court in Blackledge wrote, "[W]hat*

*Machibroda and Fontaine indisputably teach, however, is that the barrier of the plea or*

*sentencing proceeding record, although imposing, is not invariably insurmountable." In*

*other words, "... the federal courts cannot fairly adopt a per se rule excluding all possibility*

*that a defendant's representations at the time his guilty plea was accepted were so much*

*the product of such factors as misunderstanding, duress, or misrepresentation by others as*

*to make the guilty plea a constitutionally inadequate basis for imprisonment." Blackledge,*

*431 U.S. at 74.*

25. The government attempts to use Hornbuckle's biography of his experience,

to arrive at the conclusion that Hornbuckle is a medical expert. This line of reasoning fails

and Hornbuckle's statements, professing ignorance about medically necessary tests, are accurate, Hornbuckle is not a Medical Doctor, nor does he claim to have the diagnostic expertise as a licensed physician. The ecosystem of the ordering of the tests, the quality control, oversight / telehealth supervision, administering, interpretation, and medical billing were all performed by medical professionals under general, direct, and personal supervision by Board Certified Pain Management Physicians who retained the highest level of credentials. Dr. Eshan Abeshain was mentioned in Hornbuckle's emails begging for a continuance. Dr. Eshan is a Johns Hopkins trained Pain Management physician and at the time was VP of Kure Pain. He was recruited through a recruiting agency and contracted with Dr, Eric Beck at VCNSR as the interpreting physician of VCNSR and QBR LLC. Hornbuckle urged Pulliam to contact him as a professional key witness as he oversaw the supervision of the tests, quality control, and the calibration of the equipment. Dr. Eric Beck's professional corporation "Valley Center for Nerve Studies and Rehabilitation" was geared specifically toward Nerve Conduction Studies in Pain Management. Both Dr. Beck and Dr. Eshan were board certified in Pain Management for Electrodiagnostic Studies and Pain Management. Nerve Conduction is the gold standard in identifying pre-diabetic and the source, type of severity of pain. This is just more speculation by Ward.

## CONCLUSION

Hornbuckle has successfully argued in detail, on the record, supported by evidence, in his initial 28 U.S.C. Section 2255 filing all the true and factual events that transpired in his case. It is unfathomable that Hornbuckle's grounds to **GRANT,** his 28 U.S.C. section 2255 claims would not succeed. The government has failed conclusory in its opposition by contradicting itself and inflating unsubstantiated allegations. The government alleges the recordings lack context yet assert it has enough context to determine hyperbole. This filing is made in support of Hornbuckle's 2255 motion, by correcting errors and false

allegations made not only by the government but by Hornbuckle's defense attorneys, in yet another attempt to mislead this honorable court, to conceal the truth and their participation in the wrongful conviction of Hornbuckle. It also shows a concerted effort by the government, Hornbuckle's attorneys, and an impartial, politically connected judge to disallow vital evidence, crucial to Hornbuckle's defense to protect involved parties. Hornbuckle formally declares his innocence, and feels he has sufficiently presented arguments to guarantee his rights under the 2255 provisions, on the grounds he has cited. Hornbuckle motions this Honorable court to **GRANT** his 28 U.S.C. Section2255 motion in the interest of justice and due process. The record the government cites is void, as it was obtained by coercion, misguidance, and under extreme duress.

## **SERVICE**

This motion is being served on the United States Attorney PRIM F. ESCALONA, Assistant U.S. Attorney J.B.  Ward, at the U.S. Department of Justice United States Attorney Northern District of Alabama 1801 Fourth Avenue North Birmingham Alabama 35203-2101, and the Clerk of Court, Greer M. Lynch.

## **CERTIFICATION**

I hereby certify that a copy of this motion was served on the Clerk of Court, Greer M. Lynch, US DISTRICT COURT for the NORTHERN DISTRICT of ALABAMA.

## CERTIFICATE OF NOTICE OF SERVICE

JUDGE OF THE DISTRICT COURT OF ALABAMA, HONORARY LILES C. BURKE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

Because this MOTION is submitted Pro Se it is requested that it be liberally construed in accordance with Haines v. Kerner, 404U.S.C. 519, 529, (1972), and hold Mr. Hornbuckle to less stringent, in standard, than formal pleadings drafted by lawyers. Wherefore the reasons stated, Mr. Hornbuckle amicably PRAY that this Honorable Court GRANT the MOTION as submitted.

## CERTIFICATE OF SERVICE

I, John Scott Hornbuckle, certify that on ___7th  July___ 2025, by mail this submission and any exhibits attached were sent to the Clerk of Court's Office to be docketed and by this said office, made electronically available to all attorneys or record including the United States Attorney of the Northern District of Alabama as well as the Honorable Attorney General of The United States of America.

Respectfully Submitted,

John Scott Hornbuckle
Register Number 96094-509
Pensacola FPC
P.O. Box 3949
Pensacola, FL 32516



Sara D. Kennedy
Comm.: HH 419256
Expires: Jul. 10, 2027
Notary Public - State of Florida

# EXHIBIT A

MAXWELL H. PULLIAM

301 NORTH 19TH STREET
THE KRESS BUILDING, SUITE 519
BIRMINGHAM, ALABAMA 35203
T (205) 314-0620  .  F (205) 314-0621
max@mpulliam.com  .  www.mpulliam.com

November 11, 2022

VIA ELECTRONIC TRANSMISSION ONLY (hornbuckle.john@gmail.com)
PERSONAL AND CONFIDENTIAL
Mr. John Hornbuckle
243 Pine Street
New Hope, AL 35760

RE:    *United States v. John Hornbuckle*
       *(5K1 Sentencing Departure Opportunities )*

Dear John:

This letter will emphasize the urgency of the tasks presented to you by the United States in order for you to earn the greatest credit for cooperation which will directly impact your sentence. Please recall that Assistant United States Attorney Don Long stressed that the deadline to accomplish these immediate tasks is a matter of days.

Please search your current and old phones for text messages between you and: 1) Dr. Eshan Abdeshahian; and/ or 2) David Shehi. When you locate the text messages, telephone me immediately (nights or weekend) and let me know what you have found. My office has the ability to download those texts and get them to the government. Do not erase the text messages from the phone, the tablet, or the computer, if you use any of those devices to send text messages.

Next, please locate all email messages that you sent, received, or were copied on for which: 1) Dr. Eshan Abdeshahian; and or, 2) David Shehi were recipients, senders, or also copied. Please do not consider whether the emails have been previously produced to the government by you or QBR, or any lawyer acting on your or QBR's behalf. Please accumulate all the emails you locate and call me immediately upon the accumulations. I believe you can download those emails to a flash drive and bring it to me, or we can use a fileshare service to speed up the process.

Joshua Lowther is copied on this letter, and I'm sure he would also be available to answer any questions you may have. Please move with all deliberate speed to accomplish these tasks.

Sincerely,

Maxwell H. Pulliam

MHP/drp

cc:    Joshua Lowther, Esq.

**EXHIBIT B**

MAXWELL H. PULLIAM

301 NORTH 19TH STREET
THE KRESS BUILDING, SUITE 519
BIRMINGHAM, ALABAMA 35203
T (205) 314-0620 . F (205) 314-0621
max@mpulliam.com . www.mpulliam.com

August 9, 2022

VIA ELECTRONIC TRANSMISSION ONLY (hornbuckle.john@gmail.com)
PERSONAL AND CONFIDENTIAL
Mr. John Hornbuckle
243 Pine Street
New Hope, AL 35760

RE:    *United States v. John Hornbuckle*

Dear John:

This will confirm my oral report to you following my meeting with Assistant United States Attorney J.B. Ward and Investigator Katherine Henken-Gerhardt. The meeting took place in my office on Monday afternoon, August 8, 2022. As you know, the purpose of my meeting was to advocate your ability to assist the government in a prosecution of the public official who was paid by or through QBR, LLC, over a period of years for the public official's influence of Blue Cross Blue Shield of Alabama in credentialing Brian Bowman's company, Compass Labs. As I reported in our phone call, Ms. Gerhardt and Mr. Ward were adamant that you could be useful if you possessed a communication in the calendar year 2017 that related back to 2013 through 2016, the years in which the public official's consulting company was being paid.

The representatives of the government acknowledge that the information which you possess could have been helpful if it was shared with them sooner. You have explained to me how you felt when you were served with papers or otherwise contacted by agents of the government, and I am not at all being critical of your decision. The government believes if you had come forward when first contacted, you could have clearly benefitted yourself greatly by providing them with the information regarding the public official's conduct.

Ms. Gerhardt and Mr. Ward also mentioned that an opportunity continues to exist for you to "help yourself" by providing information on the four persons which you and I discussed our call. I acknowledge what you said to me about having no information which would be beneficial to the government about those persons.

I received your text message this morning requesting another meeting with me, which I welcome and am happy to arrange. Just give me a call and we can look at our respective schedules, please. Thank you.

Sincerely,

Maxwell H. Pulliam

MHP/drp

**EXHIBIT C**

1819 Article- The Story

https://1819news.com/news/item/chris-mccutcheon-used-fathers-political-access-to-boost-business-spent-thousands-of-company-money-on-lavish-vacations

1819 Article - Alabama's Hunter Biden

https://1819news.com/news/item/joey-clark-meet-alabamas-hunter-biden-how-chris-mccutcheon-used-daddy-and-his-connections-for-self-enrichment-while-avoiding-prosecution

1819 Article - Matt Clark

https://1819news.com/news/item/matt-clark-why-the-mccutcheon-story-is-so-important

1819 Article - Amie Beth Shaver

https://1819news.com/news/item/amie-beth-shaver-in-a-world-of-self-serving-politicians-be-like-rue

1819 Podcast

https://rumble.com/v2aj1ny-alabama-news-roundup-mccutcheon-steven-reed-the-auburn-plainsman-and-reviva.html

1819 Article - Political Intervention

https://1819news.com/news/item/mac-mccutcheon-intervened-in-the-legislative-process-for-qbr-documents-show

1819 Article - Talk Radio

https://1819news.com/news/item/bryan-dawson-talks-the-mccutcheon-connected-qbr-scandal-on-fm-talk-1065

1819 Article - Financially Linked

https://1819news.com/news/item/mccutcheon-financially-linked-to-ceo-guilty-of-kickbacks-fraud-records-show-favorable-treatment-from-bcbs-during-tenure

1819 Article – Ethics Commission Member

https://1819news.com/news/item/fmr-ethics-commission-member-stewart-tankersley-on-mccutcheon-ties-to-qbr-it-smells-odd

1819 Article –Dawson Breaks the Story

https://1819news.com/news/item/listen-1819-news-ceo-bryan-dawson-breaks-down-mac-mccutcheon-qbr-saga-on-news-talk-93.1

**EXHIBIT D**

## Federal Rule of Civil Procedure regarding Qui Tam:

In these qui tam revisions, Congress authorizes any person to prosecute - on behalf of the United States and in the name of the United States - a civil fraud action for treble damages and penalties against any person who allegedly makes a false claim to the United States' Government. The qui tam plaintiff is empowered to sue on the government's behalf even if he has sustained no personal injury. As a bounty for prosecuting the fraud, the qui tam plaintiff receives up to thirty percent of of any damages and penalties recovered, with the balance paid into the United States Treasury. (1)

Missing from the civil records, and criminal actions are important dates, names, and titles of ownership, and former ownership of various shell companies paid by Christopher McCutcheon. Also, key witness testimony and evidence to support mis a use of power are missing from the civil record.

It seems absurd that a CFO and 49% owner of a company (see exhibit D, QBR's Operating Agreement) can sue a partner into a settlement agreement, file a qui tam on the exact same day, and continue being paid $160,000 while a DOJ investigation is ongoing. I think it is also not a coincidence that QBR was subpoenaed by the DOJ less than three weeks after the final settlement payment was made to Mr. McCutcheon.

**EXHIBIT E**

**SAPHIER AND HELLER**[*]

LAW CORPORATION

2029 CENTURY PARK EAST, SUITE 2500

LOS ANGELES, CALIFORNIA 90067-3011

TELEPHONE (310) 789-1101

FAX (310) 789-1103

[*] Dona L. Heller - Inactive

WRITER:

Beth A. Kase

bkase@saphierheller.com

January 24, 2006

Hornbuckle, Inc.

10008 National Boulevard

Suite 414

Los Angeles, California 90034

Attn: John Hornbuckle, President

Re:   Regulatory Analysis of Proposed Mobile IDTF Arrangement

Dear John:

You have requested our advice regarding the applicability of certain health care regulatory provisions to a proposed business model to be established by Hornbuckle, Inc., a California corporation (the "Company"). The general purpose of the business is to own and operate a Medicare-approved and enrolled independent diagnostic testing facility ("IDTF") that will perform mobile diagnostic nerve conduction studies using the following CPT codes: 95900, 95903, 95904, and 95934. Set forth below is our understanding of certain facts relating to the business, followed by a summary of our analysis of certain regulatory considerations applicable to the business. If any of these facts are inaccurate, please let me know as our regulatory analysis is based on these facts.

I.   Factual Background.

The Company owns or leases the portable diagnostic equipment used to perform the tests. The Company contracts with technicians who hold appropriate credentials, as required by the Medicare program, to perform the tests. The Company contracts (or will contract) with one or more supervising physicians and interpreting physicians who hold proper credentials, as required by the Medicare program, to supervise the IDTF's provision of the nerve conduction studies and to interpret the test results. The Company's contract with the supervising physician/interpreting physician and other contracts will be prepared or reviewed by this firm. The supervising physician/interpreting physician will not refer patients to the IDTF for testing.

The procedures performed by the IDTF will be specifically ordered in writing by the physician who is treating the patient for a specific medical problem and who uses the test

34403.03B/1.24.06

Hornbuckle, Inc.
January 24, 2006
Page 2

results in the management of the patient's specific medical problem. (In this letter, the treating physician and his or her medical group, as applicable, will be referred to, collectively, as the "Treating Physician"). The written order will specify the diagnosis or basis for testing, the tests ordered, and the signature of the ordering physician.

The nerve conduction tests will be performed in a designated treatment room within the Treating Physician's office, which the Company will sublease from the Treating Physician for the IDTF's exclusive use during fixed blocks of time. The duration of the rental periods and the size of the space rented will not exceed that which is reasonably necessary. The rental rate is to be a fixed fair market rental rate, set in advance, without taking into consideration the volume or value of any referrals from the Treating Physician to the Company. The term will be at least one year. In addition, the Treating Physician will provide to the IDTF certain other items and services, such as use of the office waiting room and reception services, preparation of the testing room (janitorial services, etc.), the provision of gowns, as necessary and appropriate, and other items and services, for which the Company will compensate the Treating Physician at a fixed fair market rate set in advance, without taking into consideration the volume or value of any referrals. The terms by which the Company will sublease space from and procure the above-described items and services from the Treating Physician will be documented in writing prepared or reviewed by this firm. Neither the Company nor the supervising/interpreting physician will refer patients to the Treating Physician.

The IDTF's contracted technician will perform the tests under the direct and ongoing oversight of the IDTF's supervising physician. The supervising physician will provide that degree of supervision required by Medicare for the payment of the procedure, but the supervising physician will not be personally present during the performance of the procedures. The IDTF's contracted interpreting physician will interpret the test results. The IDTF will bill globally for the professional and technical components of the tests. The Treating Physician will not bill for either the professional or the technical component of the tests.

II.    Summary of Legal Conclusions.

   A.    Operation of IDTF.

      1.    Under the proposed business plan, the Company should meet the Medicare program's IDTF criteria and be permitted to enroll in the Medicare program as a mobile IDTF.

Hornbuckle, Inc.
January 24, 2006
Page 3

      2.    Under applicable Medicare IDTF laws and policies, as a Medicare-enrolled IDTF, the Company may perform nerve conduction tests within the Treating Physician's office, contract with an interpreting physician to interpret the test results, and bill the Medicare program globally for the technical component and the professional component of the tests.

    B.    <u>Self-Referral Law Analysis</u>.  Nerve conduction tests are not "Designated health Services" under the Federal and California's self-referral statutory schemes; accordingly, the self-referral laws are not implicated.

    C.    <u>Anti-Kickback Law Analysis</u>.  So long as the remuneration amounts that the Company pays to the Treating Physician for office rental and other items and services are consistent with fair market value and the arrangement is properly documented, the arrangement should not be considered to be a violation of the federal and California's anti-kickback statutes.

III.    <u>Summary of Legal Analysis</u>.

    A.    <u>Operation of IDTF</u>.  Under 42 CFR 410.33, a Medicare-enrolled IDTF is permitted to perform and be reimbursed by the Medicare program for diagnostic procedures furnished in a physician's office.  The regulation provides in part:

        "... carriers will pay for diagnostic procedures ... when performed by ... an independent testing facility (IDTF).  An IDTF may be a fixed location, a <u>mobile</u> entity, or an individual nonphysician practitioner.  It is independent of a physician's office or hospital; however, <u>these rules apply when an IDTF furnishes diagnostic procedures in a physician's office</u>."

(Underlining added to point out that mobile entities may be IDTFs and that mobile IDTFs may perform and bill for tests performed in a physician's office.)

    Without enumerating all Medicare criteria for IDTFs, I will highlight certain applicable criteria, as follows.

    1.    <u>Supervising Physician's Supervision</u>.  The technicians must perform the tests under the appropriate level of supervision as required for each type of test (i.e., general, direct or personal supervision).  Pursuant to Medicare Local Coverage Determination (LCD)

34403.03B/1.24.06

Hornbuckle, Inc.
January 24, 2006
Page 4

for Independent Diagnostic Testing Facilities (L19892) at page 143, each of the applicable nerve conduction procedures requires "Level of Physician Supervision 1," which refers to "general supervision." General supervision requires the physician's "overall direction and control;" the physician's personal presence is not required. (42 CFR 410.32) Accordingly, the test performed by an appropriately credentialed technician must be under the supervising physician's overall direction and control, but the supervising physician's personal presence is not required.

  2. <u>Billing</u>. IDTFs are permitted to bill globally for the technical and professional components of diagnostic tests, subject to certain criteria (such as the medical necessity of the tests and other criteria) which are beyond the scope of this letter.

  Based upon the foregoing analysis and the facts presented, the Company should meet the criteria for enrollment as an IDTF in the Medicare program. As such, it should be able to bill the Medicare program globally and be reimbursed for the technical and professional components of the nerve conduction tests. The supervising/interpreting physician and the Treating Physician should not bill for any part of the tests. Nor should the Treating Physician bill for an office visit solely on the basis that the test is performed in the office. (We have not investigated whether the Company may bill globally and be reimbursed by non-Medicare payors.)

  B. <u>Financial Arrangements between Company and Treating Physician</u>.

  1. <u>Federal and State Self-Referral Laws</u>. The Federal (Stark) self-referral law (42 U.S.C. 1395nn; Section 1877 of the Social Security Act), California's Physician Ownership and Referral Act (California Bus. & Prof. Code Sections 650.01 and 650.02), and California's workers' compensation law applicable to referrals of workers' compensation patients (California Labor Code Sections 139.3 and 139.31) generally prohibit referrals – but only of certain kinds of services ("Designated Health Services" or "DHS") – by a physician to an entity with which the physician has a financial arrangement.

  Based upon a review of the self-referral laws and of the list of CPT/HCPS Codes to which the Federal physician self-referral prohibitions apply (as published in the Federal Register dated November 21, 2005 at 70283 and Addendum H therein), and discussions with a representative of the Centers for Medicare and Medicaid Services, we have concluded that the nerve conduction tests to be provided by the Company are not DHS under Federal and California self-referral laws. (Naturally, we did not identify our client or any physician by name in any of our conversations with any such representatives.) Accordingly,

34403.03B/1.24.06

Hornbuckle, Inc.
January 24, 2006
Page 5

the self-referral laws are not applicable to the present arrangement. If the Company adds other tests which are DHS (such as ultrasound tests), further analysis of the Company's arrangement with the Treating Physician will need to be done.

2.    Federal and State Anti-Kickback Laws.

(a)    Federal Anti-Kickback Analysis.

(i)    Federal Anti-Kickback Statute. The Medicare/Medicaid anti-fraud and abuse law (42 U.S.C. 1320a-7b; Section 1128B of the federal Social Security Act) provides that any person who knowingly and willfully solicits or receives any remuneration in return for referring an individual for the furnishing or arranging for the furnishing of any item or service, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item, for which payment may be made in whole or in part under a federal health care program, is guilty of a felony. The law also applies to any person who offers or pays such remuneration to induce a person to make such a referral or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any such good, facility, service, or item.

We have considered whether the remuneration that the Company pays to the Treating Physician for office rental and other items and services may be deemed to be remuneration paid to induce the Treating Physician's referral of the diagnostic tests in violation of the Anti-Kickback Statute. So long as the remuneration amounts are consistent with fair market value and the arrangement is properly documented, the arrangement should not be considered to be a violation of the Anti-Kickback Statute, as described more fully below.

(ii)    Safe Harbors. So-called "Safe Harbor" rules have been published that set forth criteria which, if satisfied, protect the parties against being found to be in violation of the Anti-Kickback Statute. It is not a requirement that one satisfy the Safe Harbor rules, but it is advisable to do so if possible, as there would be no violation if the Safe Harbor requirements are satisfied.

The Safe Harbor rule applicable to the rental of office space or equipment provides that the Anti-Kickback Statute is not violated when the physician's only 'financial interest' is an agreement for the rental of office space or equipment which meets all the following tests:

34403 03B/1.24.06

Hornbuckle, Inc.
January 24, 2006
Page 6

1)   the agreement is written, signed by both parties and specific as to what it includes;

2)   the agreement is for a term of at least one year;

3)   the rent is set at 'fair market value,'[1] without considering the volume or value of referrals, of other property for general commercial purposes, not taking into account its intended use or its proximity to referral services;

4)   the *aggregate* rental charge is set in advance; and

5)   if the lease is intended to provide the lessee with access to the premises or use of the equipment for periodic intervals of time, rather than on a full-time basis for the term of the lease, the lease specifies exactly the schedule of such intervals, their precise length, and the exact rent for such intervals.   (Part time leases with fluctuating schedules will not fall within the safe harbor.)

Because the Treating Physician will provide certain office staff personal services to the Company, the financial arrangement between the Treating Physician and the Company should be structured to meet the Safe Harbor rule applicable to personal service arrangements to the greatest extent possible.   The elements of this Safe Harbor are similar to the elements listed above for the rental Safe Harbor, and will not be set forth in detail in this letter.  If you desire such detail, please let me know.

The sublease arrangement[2] and the personal service arrangement between the Company and the Treating Physician should be documented in writing, reviewed or prepared by this firm to comply with the foregoing elements of the rental and personal service arrangement Safe Harbors.  Based upon the facts presented herein and such documentation, the financial arrangement between the Company and the treating Physician will comply with these Safe Harbors.

(iii)   OIG Special Fraud Alert Addressing Rental of Office Space in Physician Offices.  On February 23, 2000 the Office of Inspector General (OIG) issued a Special Fraud Alert addressing rental of office space in physician offices to persons or

---

[1] The OIG provides guidance for calculating fair market value rental in its  Special Fraud Alert addressing rental of office space in physician's offices discussed below.

34403.03B/1 24.06

Hornbuckle, Inc.
January 24, 2006
Page 7

entities to which the physician may refer. According to the OIG, excessive rental payments could be disguised kickbacks to physician landlords for referrals, and could violate the Anti-Kickback Statute. (The analysis would apply to payments for personal services, as well.) The OIG identified "mobile diagnostic equipment suppliers that perform diagnostic related tests in physicians' offices, among the types of arrangements that might be suspect. Accordingly, it is important that the arrangement between the Company and the Treating Physician comply with the guidance outlined in the Fraud Alert.

        (A)   <u>Fair market rental</u>. Pursuant to the Fraud Alert, among other factors that I will not address herein, generally, the Company's rent should not exceed its pro rata share of the Treating Physician's primary charges for its office space (including its "exclusive office space," "interior office common space," and "building common space") based upon space [per square foot] and time considerations. (For more specific guidance for calculating fair market rental, the formula set forth in the Fraud Alert should be consulted.)

        It strikes us that fair market rental should also take into consideration other office expenses borne by the Treating Physician, such as utilities, telephone/fax, tenant improvements (such as carpeting, cabinets, furniture, window coverings, and the like). Accordingly, in our view, fair market value rental should be based upon the Company's pro rata share of the Treating Physician's primary charges for the space, including the Treating Physician's charges under its master lease and other office charges, such as utilities, telephone/fax, and office tenant improvements, as applicable. Likewise, the Company may also compensate the Treating Company the fair market value of other items and services the Treating Physician will provide, such as office staff reception and appointment services, room preparation, the provision of gowns, and the like, as applicable. The calculation of fair market value should be documented.

        (B)   <u>Commercially reasonable</u>. The Fraud Alert also advises that "[s]uppliers should only rent premises of a size and for a time that is reasonable and necessary for a commercially reasonable business purpose of the supplier ... rental amounts paid for time when the rented space is not in use by the supplier" may be suspect. Accordingly, the scheduled time period and designated space set forth in the sublease should be commercially reasonable for the IDTF's legitimate business needs.[2]

---

[2] The Fraud Alert gives as an example of a suspect arrangement: "rental amounts for time when the rented space is not used by the supplier. For example, an ultrasound supplier has enough business to support the use of one examination room for four hours each week, but rents the space for an amount equivalent to eight hours per week." In the event it turns out that the IDTF does not actually need to use the space for all the scheduled time, since the arrangement will be structured to comply with the Safe Harbors, the arrangement should not be deemed to

Hornbuckle, Inc.
January 24, 2006
Page 8


          (C)    <u>California Business and Professions Code Section 650</u>. Business and Professions Code Section 650 provides, in pertinent part, that –

> "... the offer, delivery, receipt, or acceptance by any [physician or other licensee] of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person ... is unlawful."

          The thrust of this statute is similar to that of the Anti-Kickback Statute, although it covers referrals in California generally, including referrals of Medicare and non-Medicare patients.  (The Anti-Kickback Statute covers referrals of Medicare and Medicaid patients.)

          Section 650 would prohibit the Treating Physician from referring patients to the Company for tests if the compensation that the Company pays to the Treating Physician is considered to be remuneration for the Treating Physician's referrals. However, in this case the compensation is the fair market value for rental space and other items and services the Treating Company will provide to the Company, and is not remuneration for the referral of patients.  In this respect, the arrangement comports with the following provision of Section 650:

> "The payment or receipt of consideration for services other than the referral of patients ... shall not be unlawful if the consideration is commensurate with the value of the services furnished or with the fair rental value of any premises or equipment leased or provided by the recipient to the payer."

          Thus, the Company's payment to the Treating Physician for the rental space and for other items and services would not be prohibited by Section 650 so long as the consideration is commensurate with the value of the rental space and the other items and services furnished.

        *           *          *

---

violate the Anti-Kickback Statute simply because the rental amount is paid for time that the rented space is not used by the Company.  If this should happen, do not amend the lease during the one year term to lower the rent without consulting with healthcare counsel first.

34403.03B/1.24.06

Hornbuckle, Inc.
January 24, 2006
Page 9


Because of the complexity of the laws and regulations mentioned in this letter, it is particularly important that all documentation be carefully prepared and that the arrangements be implemented in strict accordance with the requirements discussed in this letter. If you have any questions regarding these requirements, please be sure to discuss them with us. The documentation may include other terms and conditions, not inconsistent with the foregoing, that we recommend in order to properly document the arrangements. Once the documents are finalized, they should not be modified without legal review by health care counsel, as the applicable statutes and regulations are quite technical and could easily be violated inadvertently.

Please bear in mind that the statutes and regulations discussed above are subject to change from time to time, as this is an area that is likely to evolve through amendments to the statutes, new and modified regulations, judicial interpretations, advisory opinions, and policy changes. Accordingly, developments in this area should be monitored.

Please let me know if you have any questions regarding the subject matter of this letter. This letter is written for the benefit of Hornbuckle, Inc., and is not to be relied on by any other entity or person.

Sincerely,

*Beth Kase*

Beth A. Kase


BAK/csc

34403.03B/1.24.06

# EXHIBIT F



## Re: Brian Bowman video date - Gov't Exhibits - our exhibit list due Monday Oct 31

1 message

**John Hornbuckle** <hornbuckle.john@gmail.com>                                    Wed, Oct 26, 2022 at 7:36 PM
To: Max Pulliam <max@mpulliam.com>, Joshua Lowther <jlowther@lowtherwalker.com>, Diane Partain <diane@mpulliam.com>

Hello Gentlemen,

I hope this email finds you well. I am requesting to file a motion for continuance to allow us extra time to prepare for this trial, confirm & interview witnesses to help the defense & get our exhibit list compiled as well as the source documents to support the lists compiled. We are not prepared today to give the jury the best optic into the actual facts and it is very concerning to me facing years in prison as an honest God fearing man. Beyond my mother having 2 life threatening strokes & barely surviving a month in the hospital recently & me being her primary caretaker, we really need to rely on the CPA firms QBR LLC worked with to generate accurate source financial data to stand up to trial & rules of evidence requirements. We have not even communicated with any CPAs or accounting firms & this entire story is about money & Insurance Trusts which are the largest major financial institutions in Alabama & across the U.S. I know Honorary Judge Scott Coogler is a solid & fair no-nonsense judge who wants to protect Alabama citizens from possible selective & unjust prosecution from three letter government agencies & I think we have good cause for needing a delay to adequately prepare our defense. It seems the prosecution would most likely agree to a continuance & our motion may on its surface be disfavored but it seems obvious to me the ends of justice require a continuance in this matter. I am open to the amount of time (3-4 months) needed but interviewing witnesses, issuing subpoenas, & getting CPAs to cooperate is imperative.

I really think we need the board certified pain management interpreting physician Dr. Eshan Abdeshahian at the trial. He was responsible for quality control of the tests, & worked for Dr. Eric Beck's practice who billed the claims seems like it weakens our case. I mean what could he possibly say negatively about me when he was in charge of the quality control and calibration of the diagnostic equipment? He along with other Neurologists were the most integral / critical part of the service. Literally the integrity of the diagnostic service working in concert with the technicians and the ordering physician customers. The witness names were socialized months ago & they have not been interviewed and we need to find & secure witnesses. We may have been misled with the FBI voicing interests in bigger fish but surprisingly, they plan on ruining my life & allowing the individuals who made off with the cash continue business as usual.


Respectfully,

John Hornbuckle

**EXHIBIT G**

## Services Agreement Review and Letter of Opinion - QBR, LLC

6 messages

---

**Chris McCutcheon** <qbrdx.cmccutcheon@gmail.com>                                        Mon, Jan 30, 2012 at 1:30 PM
To: c.mac.mccutcheon@gmail.com
Cc: John Hornbuckle <qbrdx.jhornbuckle@gmail.com>, Robert Hornbuckle <rob.hornbuckle2009@gmail.com>

Mr. McCutcheon,

We, as QBR representatives, are presenting this services agreement to you for review and stated opinion from the State
Attorney General's office. We would like to receive the assessment from the AG's office in order to ensure that we
operating within the specified guidelines of the medical industry as well as the State of Alabama. Please pass this
agreement to state personnel and advise when completed so that we can move forward with the current agreement or
make the required changes to do so. Thank you for your assistance.

Respectfully,

Chris McCutcheon
Vice President, QBR-LLC
P.O. Box 6289
Huntsville, AL 35813
256.489.5273 - office
256.682.6112 - mobile


  SERVICESAGREEMENTV5.docfinal.doc
  47K

---

**John Hornbuckle** <qbrdx.jhornbuckle@gmail.com>                                        Mon, Jan 30, 2012 at 5:00 PM
To: Chris McCutcheon <qbrdx.cmccutcheon@gmail.com>

Terrific
[Quoted text hidden]

--
John Hornbuckle
[Quoted text hidden]

---

**John Hornbuckle** <qbrdx.jhornbuckle@gmail.com>                                        Wed, Nov 12, 2014 at 11:47 AM
To: John Hornbuckle <hornbuckle.john@gmail.com>

Sent from my iPhone

Begin forwarded message:

[Quoted text hidden]


  SERVICESAGREEMENTV5.docfinal.doc
  47K

---

**John Hornbuckle** <qbrdx.jhornbuckle@gmail.com>                                        Wed, Nov 2, 2016 at 2:58 PM

U.S. POSTAGE
FCM LG ENV
NEW HOPE,
JUL 07, 2025

**$12.3**
S2324N502

35203

Retail

RDC 99

UNITED STATES POSTAL SERVICE

CERTIFIED MAIL

9589 0710 5270 2298 4176 35

John Hornbuckle
#96094-509
Federal Prison Camp
P.O. Box 3949
Pensacola, FL. 32516

UNITED STATES DISTRICT C
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION
ATTN: Greer M. Lynch    Room 140
1729 5th Avenue North
Birmingham, Alabama 35203

SECURITY

JUL 14 2025

U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

RETURN RECEIPT REQUESTED

RETURN RECEIPT REQUESTED

RETURN RECEIPT REQUESTED