FILED
2025 Aug-19 AM 11:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

NORTHEASTERN DIVISION

FILED
2025 AUG 19  A 10: 42
U.S. DISTRICT COURT
N.D. OF ALABAMA

JOHN HORNBUCKLE,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

Civ. 5:24-cv-8006-LCB

Crim. 5:22-cr-78

**MOTION TO DISQUALIFY ASSISTANT UNITED STATES ATTORNEY AND UNITED STATES ATTORNEY OF THE NORTHERN DISTRICT OF ALABAMA**

TO THE HONORABLE COURT:

Petitioner John Hornbuckle, proceeding pro se, respectfully moves this Court to disqualify United States Attorney Prim F. Escalona and Assistant United States Attorney John B. Ward from representing the United States in the above-captioned matters. In support of this motion, Petitioner states:

# I. INTRODUCTION

This motion seeks disqualification of prosecution counsel based on actual and apparent conflicts of interest arising from recorded statements made by Petitioner's former defense attorney, Maxwell H. Pulliam. These statements, which are part of the record (Doc. #11 and #17), created compromising situations that prevent the prosecution from proceeding

with the requisite impartiality, including prosecutorial misconduct, ethical violations,

impropriety of judicial process, due process violations, obstructions, misapplication of

mens rea, suppressing of exculpatory evidence, statutory violations, selective prosecution,

suborning of perjury, supreme court rulings and case precedent. The cumulative effect of

the prosecution's criminal conduct, suborning of perjury, systematic entrapment attempts,

and fundamental misunderstanding of applicable healthcare statutes is substantial and

requires immediate disqualification to restore the integrity of the judicial process and

ensure Petitioner receives constitutionally mandated due process protections. It

demonstrates a complete breakdown of prosecutorial neutrality.

## II. FACTUAL BACKGROUND

1. **Case History**: Petitioner was represented by attorney Maxwell H. Pulliam and

   Joshua Lowther in criminal case 5:22-cr-78. The sentencing judge, L. Scott

   Coogler has since retired, and the case has been reassigned to the Honorable Liles

   C. Burke.

2. **Audio Evidence**: Audio recordings submitted to the court record (See Doc.11,& 17,

   Exhibits A-D) reveal that defense attorney Pulliam made statements to Petitioner

   including:

   - Petitioner would "end up in the G**damn river" if he proceeded to trial
   - "The fix was in, politically" with Judge Scott Coogler, who was "well connected"
   - Petitioner was "railroaded, set up and was innocent"
   - Former U.S. Attorney Jay Town "may put Bartley Loftin in a river"
   - Judge Coogler "shut that ass down" when evidence about the McCutcheons was attempted to be introduced

3. **Prosecutorial Knowledge and Response**: The prosecution was aware of these recorded statements and their content. Significantly, in the government's response to Petitioner's § 2255 motion, Assistant U.S. Attorney Ward dismissed these documented death threats as "hyperbole" and "hyperbolic metaphor," demonstrating prosecutorial bias and inability to address the matter objectively.

4. **Government Solicitation of Defense Counsel**: The government improperly solicited statements from Petitioner's former defense counsel (Pulliam and Lowther) who were not parties to the § 2255 proceeding and had not been served, evidencing collusion to defeat Petitioner's constitutional claims.

5. **Case History and Precedent**: "Judge L. Scott Cooglar Case No. 5:22-cr-078-LSC-NAD" Former U.S. Attorney Jay Town "may put attorney Bartley Loftin in a River". It is significant to note that U.S. Attorney Jay Town was a known friend of attorney Bartley Loftin who represented former CFO and 49% owner of QBR LLC Chris McCutcheon, son of State Representative / Speaker of the House Mac McCutcheon in a civil case which was resolved in a settlement agreement signed on March 24th, 2017. On that same March 24th, 2017, day, McCutcheon filed a False Claim Act "Qui Tam" under seal and continued receiving payments from QBR throughout 2017, all while the FBI was conducting investigations on their targets, until the last payment was made around Christmas Eve 2017. Defendant Hornbuckle and QBR LLC would receive a Subpoena from the DOJ signed by US Attorney Jay Town in January 2018, just weeks after the final payment to McCutcheon, requesting all documents and emails. Defendant was never explained this was a Qui Tam or what a Qui Tam is. SEE Case No. 5:17-cv-000462-MHH which is currently "STAYED" and or in "ABEYANCE" where McCutcheon

is seeking a $99,000,000.00 Bounty Payment. This would cause most layman individuals or a reasonable observer to question the prosecutor's impartiality and if in fact this was a Weaponization of the DOJ used as a calculated intentional targeting and destruction of the Defendant's company, reputation and personal life and to serve as cover for McCutcheon or at least to leverage McCutcheon for something more significant, more significant than a disposable defendant like Hornbuckle and many others. Lowther informed Hornbuckle that Judge Scott Coogler said if he pleas, the sentencing guidelines to be used arrive from a $9 million case, but if he takes it to trial, Coogler will apply the more severe sentencing guidelines associated with the $59 million case, this is a violation of due process, coercion and retaliation (42 U.S.C Sec. 12203), or coercion from Lowther at best.

# III. LEGAL STANDARD

Federal prosecutors must be disqualified when actual or apparent conflicts of interest prevent them from performing their duties with requisite impartiality. Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 807 (1987). The Supreme Court has emphasized that prosecutors must be "disinterested" and free from conflicts that might compromise their judgment. Id.

The standard for prosecutorial disqualification includes:

# A. SELECTIVE PROSECUTION AS GROUNDS FOR DISQUALIFICATION

**Legal Standard for Selective Prosecution:** Selective prosecution violates the Equal Protection Clause when defendants are singled out for prosecution based on

impermissible considerations rather than legitimate law enforcement purposes. United

States v. Armstrong, 517 U.S. 456, 464 (1996). When prosecutorial selection decisions are

tainted by discriminatory intent, disqualification is required under Young v. United States

ex rel. Vuitton et Fils S.A., 481 U.S. 787, 807 (1987), because prosecutors cannot maintain

the requisite impartiality while defending discriminatory charging decisions.

Elements of Selective Prosecution:

1. Discriminatory Effect: Similarly situated individuals were not prosecuted
2. Discriminatory Intent: Selection was based on impermissible considerations such as political affiliation or personal relationships
3. Lack of Legitimate Prosecutorial Purpose: Charging decisions were not based on neutral law enforcement criteria

**Prosecutorial Disqualification Connection:** When selective prosecution creates actual

conflicts of interest or appearance of impropriety, disqualification is mandatory. United

States v. Cueto, 151 F.3d 620, 633 (7th Cir. 1998) (prosecutors must be disqualified when

reasonable observers would question their impartiality).

## B. Actual Conflict of Interest: An actual conflict exists when a prosecutor has a personal

interest that is inconsistent with the fair administration of justice. United States v. Hobson,

672 F.2d 825, 827 (11th Cir. 1982).

## C. Appearance of Impropriety: Disqualification is also warranted when circumstances

create an appearance of impropriety that undermines public confidence in the integrity of

the judicial process. United States v. Bolden, 325 F.3d 471, 477 (4th Cir. 2003). The test is

whether a reasonable observer would question the prosecutor's impartiality. United States

v. Cueto, 151 F.3d 620, 633 (7th Cir. 1998).

**D. Due Process Considerations:** The Due Process Clause requires disqualification when

prosecutorial conflicts deny defendants fundamental fairness. Brady v. Maryland, 373 U.S.

83, 87 (1963); Giglio v. United States, 405 U.S. 150, 154 (1972).

# IV. GROUNDS FOR DISQUALIFICATION

## A. Actual Conflict of Interest

The prosecution's knowledge of defense counsel's statements creates an actual conflict

under established precedent:

1. **Prosecutorial Duty Under Brady and Giglio**: Prosecutors have a constitutional

   obligation to disclose material evidence favorable to the defense, including

   evidence of coercion or ineffective assistance of counsel. Brady v. Maryland, 373

   U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972). The prosecution's failure

   to act upon knowledge of potentially coercive statements violates these

   fundamental duties.

2. **Documented Government Dismissal of Death Threats**: In the government's

   response to Petitioner's § 2255 motion, Assistant U.S. Attorney Ward characterized

   documented death threats as "hyperbole" and "hyperbolic metaphor," stating this

   the government downplays, as hyperbole, the evidence submitted **(SEE DOC 17**

   **EXHIBITS A and D)** where Pulliam tells Hornbuckle he'll end up in the GD river

   clearly shows its insensitivity, prejudice, and intent to dismiss a man being placed

under duress. This demonstrates prosecutorial bias and creates an actual conflict

preventing fair representation of the United States' interests.

3. **Improper Solicitation of Defense Counsel**: The government improperly solicited

unnotarized "affidavits" from Petitioner's former defense counsel, Pulliam and

Lowther, who were not parties to the § 2255 proceeding and had not been served.

As Petitioner noted in his response: "Neither Pulliam nor Lowther were served in this

28 U.S.C. section 2255 action from Hornbuckle, nor are they a party to it... This is

proof that the government solicited Pulliam and Lowther's statements which is

further evidence of their collusion to defraud Hornbuckle."

4. **Model Rule 3.8 Violations**: Professional Conduct Rule 3.8 requires prosecutors to:
   - Refrain from prosecuting charges not supported by probable cause (Rule 3.8(a))
   - Make timely disclosure of exculpatory evidence (Rule 3.8(d))
   - Ensure defendants' right to counsel is not violated (Rule 3.8(c))

The prosecution's conduct violated these standards by failing to investigate

documented coercion and instead characterizing it as "hyperbole." See United

States v. Modica, 663 F.2d 1173, 1176 (2d Cir. 1981).

5. **Selective Prosecution Creating Actual Financial Conflict:**

The prosecution's selective enforcement decisions create an actual conflict of interest

through financial incentives tied to the McCutcheon Qui Tam action:

**Identical Conduct, Different Outcomes:**

- Petitioner Hornbuckle: Criminally prosecuted despite attorney-approved PSA and

   AG clearance

- Chris McCutcheon (QBR LLC 49% owner): Received civil settlement on March 24,

2017, same day he filed False Claims Act "Qui Tam" and subsequent $99 million civil suit (Case No. 5:17-cv-000462-MHH), while continuing to receive settlement rather than prosecution

- Identical PSA Structure: Both operated under Professional Services Agreements for diagnostic testing services

**Government Financial Incentive in Selective Enforcement:**

The government's potential recovery from McCutcheon's Qui Tam creates direct financial incentives to:

- Criminally prosecute Petitioner to support McCutcheon's civil claims
- Suppress exculpatory evidence that would undermine Qui Tam recovery
- Maintain prosecutorial positions that enhance civil case value

This financial conflict prevents fair representation of the United States' interests, as the prosecution cannot objectively evaluate evidence that might benefit Petitioner but harm the government's potential Qui Tam recovery.

**Evidence of Discriminatory Intent:**

- Jay Town's friendship with Bartley Loftin (McCutcheon's attorney)
- Prosecutor Ward's personal knowledge of Loftin
- McCutcheon continued receiving QBR payments through 2017 while serving as government informant
- Subpoena timing: Issued to Petitioner weeks after McCutcheon's final payment

**Pattern of Political Protection:**

- Mac McCutcheon (State Representative/Speaker) facilitated AG approval for Petitioner's PSA

- Same McCutcheon used as government "checkout" asset against Dr. Shelinder Aggarwal
- Political connections determining prosecution vs. settlement outcomes.

## B. Appearance of Impropriety

The circumstances create an appearance of impropriety under the standards established in Young v. United States ex rel. Vuitton:

1. **Judicial Integrity Concerns:** The recorded statements implicate the judicial process itself, with defense counsel stating "the fix was in, politically" with Judge Scott Coogler, who was described as "well connected." Courts have recognized that prosecutorial conduct that undermines confidence in the judicial system warrants disqualification. United States v. Monsanto, 491 U.S. 600, 614 (1989).

2. **Prosecutorial Bias Demonstrated Through Court Filings:** Assistant U.S. Attorney Ward's characterization of documented death threats as "mere hyperbole" in the government's § 2255 response demonstrates an inability to address the matter impartially. As Petitioner noted: "The manner in which the government downplays, as hyperbole, the evidence submitted... where Pulliam tells Hornbuckle he'll end up in the GD river clearly shows its insensitivity, prejudice, and intent to dismiss a man being placed under duress." See United States v. Cueto, 151 F.3d 620, 633 (7th Cir. 1998).

3. **Systemic Pattern of Conflicts:** The evidence reveals a pattern of prosecutorial misconduct including:

- Failure to investigate documented coercion
- Improper solicitation of defense counsel statements
- Mischaracterization of death threats as "hyperbole"
- Use of inadmissible hearsay testimony from the Murphy case, to oppose the § 2255 motion

Similar allegations against defense attorney Pulliam exist in the pending § 2255 motion by Jason Max Akin, suggesting systemic issues the prosecution has failed to address.

4. **Ex-Parte Communications**: The evidence suggests improper ex-parte communications between the prosecution, defense counsel, and Judge Coogler, as referenced in the recorded statements about "the fix being in, politically."

5. **Selective Prosecution Creating Appearance of Two-Tiered Justice:**

   The circumstances create an appearance that prosecution decisions are based on political connections rather than legal merit, undermining public confidence in equal justice under law.

   **Reasonable Observer Analysis:** A reasonable observer aware of the following facts would question prosecutorial impartiality:

   • Identical Business Models: Both Petitioner and McCutcheon operated PSA-based diagnostic services

   • Different Legal Outcomes: McCutcheon received profitable civil settlement. Petitioner faced criminal prosecution

   • Political Connections: McCutcheon family's legislative influence vs. Petitioner's lack of political protection

- Financial Incentives: Government benefits from supporting McCutcheon's $99M

  Qui Tam through Petitioner's prosecution

**6. Appearance of Vindictive Prosecution:** The evidence suggests prosecution was

initiated not for legitimate law enforcement purposes, but as retaliation for:

- Petitioner's refusal to cooperate in entrapment schemes against others

- Petitioner's challenge to prosecutorial misconduct through recorded evidence

- Petitioner's exposure of systematic conflicts involving the McCutcheon family

**7. Systematic Pattern of Discriminatory Enforcement:**

   **Government Targeting Pattern:**

- Individuals with political connections (McCutcheon) receive special treatment, as

  he was never a defendant, never indicted, never pursued, instead he was

  insulated and protected by prosecution

- Defendants without protection (Petitioner, Dr. Aggarwal, John Robson, Jason Akin,

  Brian Bowman) faced with criminal prosecution is evidence of systematic bias

- Pattern suggests prosecution based on political vulnerability rather than legal

  Culpability

- Use of False Claims Act as weapon against competitors while protecting

  informants

**8.Judicial Obstruction:**

   Judge Scott Coogler suppressed any evidence mentioning Chester

   "Mac" McCutcheon or his son Christopher N. McCutcheon, denial of Clark

   Pendergrass testimony

## C. Ethical Violations and Professional Responsibility

The prosecution's conduct violates multiple ethical standards:

1. **Model Rule 3.4 - Fairness to Opposing Party**: Rule 3.4(a) prohibits unlawfully obstructing access to evidence, and Rule 3.4(d) prohibits making frivolous discovery requests. The prosecution's failure to investigate recorded evidence of coercion and its improper solicitation of unnotarized statements from defense counsel violates these standards. See United States v. Beaulieu, 892 F.3d 1197, 1203 (10th Cir. 2018).

2. **Duty of Candor - Model Rule 3.3**: Prosecutors must not make false statements of fact to the tribunal. Model Rule 3.3(a)(1). Ward's dismissal of documented death threats as "hyperbole" and the government's reliance on inadmissible hearsay testimony from the Murphy case may constitute material misrepresentations to the court. United States v. Associated Convalescent Enterprises, Inc., 766 F.2d 1342, 1346 (9th Cir. 1985).

3. **Prosecutorial Misconduct in § 2255 Proceedings**: The government's response to Petitioner's § 2255 motion reveals multiple ethical violations:

   - Attempting to introduce inadmissible hearsay testimony from the Murphy case
   - Characterizing documented death threats as "hyperbole"
   - Soliciting improper statements from defense counsel, not parties to the proceedings
   - Failing to address evidence of judicial bias and ex-parte communications

4. **Due Process Violations**: The prosecution's conduct violates due process under the standards established in:

- Strickland v. Washington, 466 U.S. 668 (1984) (regarding ineffective assistance)
- United States v. Cronic, 466 U.S. 648 (1984) (regarding systemic breakdowns in adversarial process)
- Berger v. United States, 295 U.S. 78, 88 (1935) (prosecutor's duty to ensure fair trial)

5. **Collusion and Obstruction of Justice:** The evidence suggests prosecutorial collusion with defense counsel to deny Petitioner due process. As Petitioner documented: "This strategy is calculated and misleading, in an attempt to undermine, discredit and conceal their willful suggestive coercion in Hornbuckle's case, threatening his life and his ability to receive a fair trial. "

# D. Precedent for Disqualification in Similar Circumstances

Courts have granted prosecutorial disqualification in analogous situations:

1. **Knowledge of Defense Counsel Misconduct:** In United States v. Levy, 577 F.2d 200 (3d Cir. 1978), the court disqualified prosecutors who had knowledge of defense counsel's conflicts but failed to act.

2. **Threats and Coercion:** Courts have found prosecutorial disqualification appropriate when prosecutors are aware of coercive tactics against defendants. See United States v. Doe, 465 U.S. 605 (1984).

3. **Systemic Office Conflicts:** In United States v. Chagra, 669 F.2d 241 (5th Cir. 1982), the court disqualified an entire prosecutor's office due to conflicts affecting the office's ability to fairly prosecute the case.

# E.  Prosecutorial Failure to Recognize Fundamental Mens Rea Requirements and Healthcare Service Classifications

## 1. Stark Law Compliance and Diagnostic Service Classifications

The prosecution's conduct demonstrates a fundamental misunderstanding of applicable healthcare fraud statutes and service classifications that creates additional conflicts requiring disqualification. The evidence establishes that **Nerve Conduction and Somatosensory Evoked Potential Diagnostics are not DESIGNATED HEALTHCARE SERVICES** at the time the business was operating under the Stark Law's self-referral prohibitions, codified at 42 U.S.C. § 1395nn Subsection (b) exceptions for physicians "Personal Services". This critical legal distinction undermines the prosecution's entire theory of the case, yet the prosecution has failed to acknowledge or address this fundamental misclassification. The government's continued pursuit of charges based on an incorrect understanding of which services fall under Stark Law restrictions demonstrates either:

- Prosecutorial incompetence that prevents fair administration of justice, or
- Willful misrepresentation of the applicable law to secure a conviction

Either scenario creates an actual conflict of interest that mandates disqualification under *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987).

## 2. Failure to Apply Supreme Court Precedent on Mens Rea Requirements

The prosecution's approach to this case demonstrates a fundamental disregard for established Supreme Court precedent regarding mens rea requirements in

healthcare fraud prosecutions. In *Elonis v. United States*, 575 U.S. 723, 734 (2015), the Supreme Court emphasized that **"wrongdoing must be conscious to be criminal"** and reaffirmed the principle that consciousness of wrongdoing is "as universal and persistent in mature systems of law as belief in freedom of the human will." The Court in *Elonis* specifically noted that defendants must be **"blameworthy in mind"** before criminal liability can attach, requiring proof that defendants knew their conduct was unlawful when "willfulness" is charged. *Elonis*, 575 U.S. at 734-735.

The prosecution has failed to acknowledge or address evidence that Petitioner:

- Sought legal counsel specifically to ensure compliance with healthcare regulations
- Operated under a Professional Services Agreement (PSA) drafted by healthcare attorneys
- Received approval from Alabama Attorney General Luther Strange for the PSA through State Representative Mac McCutcheon **(SEE EXHIBIT C)**
- Maintained at all times his belief that his conduct was lawful and compliant
- Contracted referring physician client locations
- Followed private insurance company and CMS's "frequency of testing recommendations" which allowed symptomatic patients annual nerve conduction testing

## 3. Professional Services Agreement and Good Faith Compliance

The prosecution's dismissal of documented legal advice and regulatory compliance efforts creates an appearance of prosecutorial bias that warrants disqualification. The record establishes:

**PSA Development and Legal Review:**

- Original PSA drafted by healthcare attorney in 2008
- PSA reviewed, edited, and updated by Alabama attorney in 2012 in coordination with CFO Chris McCutcheon
- PSA forwarded to State Representative Mac McCutcheon, who transmitted it to Alabama Attorney General Luther Strange **(SEE EXHIBIT C)**

- Attorney General Strange approved the PSA, with approval communicated back through Representative McCutcheon
- PSA further reviewed in 2014 by healthcare attorney Clark Pendergrass who provided redlined updates

**Transparency and Professional Oversight:**

- All operations conducted transparently under attorney-drafted PSA
- Financial oversight provided by Hilliard & McCutcheon, CPA
- Medical necessity determinations made solely by referring physicians
- No role in billing decisions or medical necessity evaluations
- Testing volume reduced by 50% in 2014 to ensure medical necessity

**United States v. Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals**, which is being litigated in the **U.S. District Court for the Middle District of Tennessee.** Once the United States has demonstrated proof of each element of a violation of the Anti-Kickback Statutes, the burden shifts to the defendant to establish that his conduct was protected by safe harbor or exception; the United States need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception. The 2007 Regulatory Analysis and PSAs are protected under the exception to the rule for in-house ancillary services and the payments are within safe harbor guidelines which included a monthly capitation to further ensure healthcare compliance. See 42 U.S.C. 1395nn Subsection (b) exceptions for physicians "Personal Services" following the Designated Healthcare Services standard. Hornbuckle made every attempt to explain the law to his defense lawyers but they resorted to threats of violence and a plea under duress verses facing political opposition, a conflicted judge and a weaponized DOJ politically influenced.

- Mac McCucheon and son Chris McCutcheon confirmed the AG Luther Strange reviewed the PSA and approved **(SEE EXHIBIT C)**
- This is confirmed in emails from CFO McCutcheon to Mac McCutcheon State Rep. This is not mere hearsay, this can be confirmed by more than 3-10 individuals so it must at least be exception to hearsay
- Original PSA and Regulatory Analysis drafted by healthcare attorney in 2008, Mac McCutcheon "socialized" PSA, not transmitted.
- Testing volume was set at a monthly "Capitation" which established an average of 5.6 patients per day to mitigate over-utilization
- AUSA Ward sought a sworn statement from AG Luther Strange just days before Hornbuckle's trial and Strange stated "I do not recall".

It begs to question why Ward would seek a 302 from the former AG if the defendant has no case and the PSA is not relevant to Hornbuckle's compliance and innocence.

The prosecution's failure to acknowledge this extensive legal compliance framework and their characterization of good faith reliance on counsel as criminal conduct demonstrates prosecutorial bias that prevents fair administration of justice.

## 4. Violation of Fundamental Due Process Under Ruan and Rehaif Precedents

The prosecution's approach violates fundamental due process principles recently reaffirmed by the Supreme Court in *Ruan v. United States*, 142 S. Ct. 2370 (2022) and *Rehaif v. United States*, 139 S. Ct. 2191 (2019).

In *Ruan*, the Court emphasized that criminal statutes must include mens rea elements that separate criminal conduct from innocent conduct and not "run the risk of ensnaring the latter within its ambit." The Court reaffirmed the principle that there is a "longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct."

The prosecution's pursuit of charges despite clear evidence of good faith

compliance efforts and reliance on legal counsel violates these fundamental due

process protections and creates an actual conflict that mandates disqualification.

## F.  Prosecutorial Misconduct in Characterizing Legal Compliance as Criminal Conduct

### 1. Mischaracterization of Attorney-Approved Business Structure

The prosecution has demonstrated bias by characterizing, as criminal conduct, a business

structure that was:

- Designed by healthcare attorneys specifically to ensure legal compliance
- Approved by the Alabama Attorney General
- Operated transparently with professional oversight
- Structured to ensure medical decisions remained with qualified physicians

This prosecutorial approach violates Model Rule 3.8's requirement that prosecutors

ensure charges are supported by probable cause and make timely disclosure of

Exculpatory evidence.

### 2. Failure to Investigate Exculpatory Evidence

The prosecution's failure to investigate and acknowledge the extensive legal compliance

framework demonstrates prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83

(1963). Exculpatory evidence includes:

- Attorney approval of business structure, and failure to interview Clark Pendergrass nor allow his testimony as a witness
- Chester "Mac" McCutcheon's involvement was not allowed in court by Judge Coogler
- State Attorney General approval of PSA
- Legislative review through State Representative McCutcheon
- Professional medical oversight of all testing decisions
- Financial oversight by certified public accountants

- Alabama AG review of PSA substantiated in emails by McCutcheon even though the government sought a 302 from AG Strange where he claims, "I do not recall".
- Certified Public Accountant offices owned by McCutcheon

## 3. Creation of Actual Conflict Through Legal Misinterpretation

The prosecution's fundamental misunderstanding of applicable healthcare service

classifications and mens rea requirements creates an actual conflict of interest that

prevents fair administration of justice. The government cannot fairly prosecute a case

when its entire legal theory is based on misinterpretation of controlling statutes and

Supreme Court precedent.

# G. Prosecutorial Criminal Conduct - Impersonation of Medical Professional

## 1. Federal Criminal Violations by Prosecution

The evidence reveals that prosecution counsel engaged in criminal conduct by

impersonating a **Certified Registered Nurse Anesthetist (CRNA)** during the

investigation to entrap Petitioner. This conduct violates multiple federal criminal

statutes:

**18 U.S.C. § 912 - Impersonating Federal Officer or Employee:** Federal law

prohibits anyone who "falsely assumes or pretends to be an officer or employee

acting under the authority of the United States" and "demands or obtains any

money, paper, document, or thing of value." While this statute typically applies to

impersonating federal agents, the principle extends to government officials acting

under color of federal authority in healthcare fraud investigations.

**Healthcare Fraud Under 18 U.S.C. § 1347:** The FBI specifically identifies "Impersonating a health care professional: Providing or billing for health services or equipment without a license" as a form of healthcare fraud. A prosecutor impersonating a CRNA commits the exact same conduct they are prosecuting others for committing.

**18 U.S.C. § 913 - Impersonator Making Arrest or Search:** This statute prohibits falsely representing oneself as a federal agent while conducting searches or making arrests. Courts have recognized that "entrapment may be a defense if law enforcement induced the defendant to commit the crime" and "if a defendant was persuaded or coerced into impersonating a federal officer by authorities, they may challenge the charges on those grounds."

## 2. Professional Ethics Violations

The prosecution's impersonation of a medical professional violates fundamental ethical standards:

**Model Rule 8.4 - Professional Responsibility:** Prosecutors are prohibited from engaging in conduct that involves dishonesty, fraud, deceit, or misrepresentation. Impersonating a licensed medical professional constitutes all four prohibited forms of conduct.

**Model Rule 3.8 - Special Responsibilities of a Prosecutor:** This rule requires prosecutors to ensure fairness in the criminal justice process. Using criminal deception tactics to obtain evidence violates this fundamental duty.

### 3. Due Process Violations and Entrapment

The prosecutor's impersonation of a CRNA creates multiple constitutional violations:

**Entrapment Defense:** Federal courts recognize entrapment as a valid defense when "law enforcement induced the defendant to commit the crime" through persuasion or coercion. Government agents who engage in criminal conduct to entrap defendants violate due process.

**Prosecutorial Misconduct:** Prosecutors who engage in criminal conduct while investigating cases create fundamental conflicts of interest that prevent fair administration of justice. The government cannot prosecute healthcare fraud while simultaneously committing healthcare fraud.

**Brady/Giglio Violations:** The prosecution's failure to disclose their own criminal conduct constitutes material exculpatory evidence that must be disclosed under *Brady v. Maryland* and *Giglio v. United States*.

### 4. State Law Violations

The prosecutor's conduct also likely violates Alabama state laws regarding:

- Criminal impersonation (Ala. Code § 13A-10-10)
- Practicing medicine without a license
- Healthcare fraud under state law

State laws typically impose "misdemeanor or felony penalties" for impersonating medical professionals, and "government prosecutors typically file these types of criminal and civil charges." The irony of a prosecutor committing the same crimes they prosecute demonstrates the fundamental conflict requiring disqualification.

## 5. Documentary Evidence of Prosecutorial Criminal Conduct

The prosecution's impersonation of a CRNA is supported by documentary evidence in the form of text messages between Attorney Bartley Loftin and Brian Bowman, **(SEE Exhibit A),** and email communications between Attorney Tommy Spina and Attorney Steven Money, and Spina and Brian Bowman **(SEE Exhibit B).** These communications provide direct evidence of the prosecutor's criminal conduct and conspiracy to entrap Petitioner through fraudulent medical impersonation.

 At the time of these communications involving Attorney Bartley Loftin and Brian Bowman, as well as the entrapment activities detailed herein involving Dr. Aggarwal, Jay Town was serving as Acting United States Attorney for the Northern District of Alabama. Assistant United States Attorney JB Ward, who orchestrated the entrapment scheme and impersonation conduct described in this motion, was operating under Town's supervision and authority during this period. Ward's criminal conduct, including the impersonation of a Certified Registered Nurse Anesthetist and the systematic entrapment attempts, occurred within the scope of his official prosecutorial duties under the direct supervisory authority of Acting US Attorney Town. Which may in part explain Town's stepping down as an U.S. Attorney.

The text message communications between Loftin and Bowman **(Exhibit A)** are material evidence that:

- Document the prosecutor's plan to impersonate a medical professional
- Establish the premeditated nature of criminal conduct
- Provide evidence of prosecutorial conspiracy to violate federal law
- Demonstrate knowledge that the conduct was improper and potentially illegal
- Support Petitioner's entrapment defense and prosecutorial misconduct claims
- Establish supervisory knowledge and disapproval of Ward's criminal conduct

- Clearly confirms AUSA JB Ward knows Bartley Loftin personally, the attorney who represented McCutcheon and now owns Compass Laboratories
- Loftin had become an owner of Compass Labs while serving as Corporate Counsel for Compass, Loftin and US Attorney are close friends and Bowman had spoken with them both specifically about pending litigations

**Additional Context for Exhibit A - Evidence of Prosecutorial Misconduct and Fraudulent Impersonation**

**Strategic Use of Professional Networks for Unauthorized Access to Technology Information:**
The September 12, 2018, text message from Bartley Loftin reveals his strategic

exploitation of professional medical connections to facilitate access to technology

processes and abstracts developed by Petitioner Hornbuckle for Brian Bowman.

Loftin describes leveraging a CRNA association dinner to make contact with the

president of the CRNA association, who serves on Alabama's opioid task force

committee. Specifically, Loftin states: "My wife drug me to a cRNA dinner where the

president of the cRNA association spoke. Guess what? He is on the opioid task

force Committee for the state of Alabama."

**Evidence of Coordinated Deception Regarding Technology Access:**

The September 12, 2018, message demonstrates coordination between Loftin and

Bowman in arranging access to technology information. Petitioner Hornbuckle had

been approached by Bowman to write processes and abstracts for Bowman's

technology concept, which Hornbuckle named "Toxicology Quotient." These

materials were presented to patent attorneys at Lanier Ford during meetings that

included both Hornbuckle and Bowman. Bowman subsequently informed

Hornbuckle that a CRNA was interested in the technology and QBR LLC, services.

Key communications supporting this coordination include:

- "I had a discussion with him about what they could do with a program that could let them know what doctors were compliant etc."
- "He wants to meet and look at the software"
- "I'll give you a call tomorrow"

Brian Bowman's enthusiastic response ("Let's do it!!!") on September 12, 2018, demonstrates his willingness to facilitate meetings and provide access to the technology information.

**Discovery of Federal Prosecutor Impersonation:** The October 31, 2018, communications reveal the involvement of J.B. Ward, a federal prosecutor who was impersonating a CRNA. Bowman explicitly states: *"JB is a fed prosecutor"* and *"I thought he was a CRNA. We gotta strategize."* This demonstrates the use of false professional credentials to gain access to proprietary technology. Ward is described as *"Jays guy on the Task force,"* indicating his connection to the Alabama opioid task force committee.

**Evidence of Technology Appropriation Concerns** The October 27, 2018, message shows explicit concern about potential appropriation, with Bowman stating: "Here are two in the last two months that would infringe on this patent. I sent the quest stuff to Jeremy in September but he never responded." This demonstrates awareness of potential unauthorized use of the technology concepts and active monitoring by Bowman.

**Timeline of Coordinated Appropriation:**

- **September 12, 2018:** Initial contact made through CRNA dinner; agreement to provide software access
- **September 14, 2018:** Discussion of competing technology (MedSolace)
- **October 27, 2018:** Documentation of patent infringement by others; discussion of protective legal action
- **October 29, 2018:** Mention of $1M grant opportunity related to the technology
- **October 31, 2018:** Discovery that J.B. Ward is a federal prosecutor, not a CRNA; discussion of strategic response

**Pattern of Deceptive Professional Networking**

The casual mention of being "drug" to a professional dinner while simultaneously orchestrating meetings to access technology information demonstrates a pattern of using legitimate professional settings to facilitate potentially improper access to Petitioner Hornbuckle. This is particularly concerning given that J.B. Ward, a federal prosecutor under Jay Town's supervision, was misrepresenting himself as a CRNA throughout these interactions.

**Petitioner's Role and Lack of Awareness**

Petitioner Hornbuckle wrote processes and abstracts at Brian Bowman's request and named the technology concept "Toxicology Quotient." which were socialized to a patent attorney of Lanier Ford and Hornbuckle and Bowman met with them in person for lunch and then again at the law firm, in Huntsville. They were also presented to Congressman Mo Brooks and on another afternoon in Montgomery with Lieutenant Governor Will Ainsworth and Senator Tom Butler. Hornbuckle did not write software code and does not own any patents or technology. Petitioner was told by Bowman that there was a CRNA interested in QBR LLC services and the technology. Hornbuckle was invited to meetings but was unaware that the purported CRNA was actually AUSA Ward. When Bowman's attorney, Erica Barnes (a former AUSA), learned of Ward's involvement, she advised Bowman against meeting with Ward, stating "no sir you are not meeting him, he is the AUSA of the northern district." Bowman subsequently cancelled meetings that would have included Petitioner Hornbuckle, though Hornbuckle remained unaware of these details until years later.

**Supervisory Knowledge and Criminal Liability:**

The email communications in **Exhibit B** reveal that Jay Town was not only aware of Ward's impersonation of a CRNA but considered such conduct to be criminal. These emails between Attorney Tommy Spina and Attorney Steven Money, and Spina and Brian Bowman, reference the text messages in **Exhibit A** and establish that:

- Jay Town was "upset" about Ward's impersonation of a CRNA and Loftin's characterization of his relationship with Town to boast and garner influence
- Town specifically considered Ward's and Loftin's conduct to be "criminal"
- Supervisory knowledge of criminal conduct extended beyond Ward to the highest levels of the US Attorney's Office
- The criminal impersonation was recognized as improper by prosecutorial leadership

This supervisory knowledge transforms Ward's individual criminal conduct into an office-wide conspiracy to violate federal law while simultaneously prosecuting others for similar conduct.

**Material Evidence of Prosecutorial Misconduct**

The text message communications between Loftin and Bowman **Exhibit A** combined with the email evidence in **Exhibit B** are material evidence that:

- Document the prosecutor's plan to impersonate a medical professional
- Establish the premeditated nature of the criminal conduct
- Provide evidence of prosecutorial conspiracy to violate federal law
- Demonstrate supervisory knowledge that the conduct was criminal and improper
- Support Petitioner's entrapment defense and prosecutorial misconduct claims
- Establish Jay Town's direct knowledge and disapproval of Ward's criminal conduct while failing to take corrective action

## Unanswered Questions Regarding the Scheme

The coordination between Bowman's request for Petitioner Hornbuckle to write technology processes and abstracts, while simultaneously working with Loftin to arrange meetings with a federal prosecutor posing as a CRNA, raises serious questions about the true purpose of this scheme. Whether this represents an attempt at technology appropriation or a deliberate setup to entrap Petitioner Hornbuckle, the involvement of prosecutorial authorities in fraudulent impersonation while pursuing a case against the same individual they were deceiving constitutes clear prosecutorial misconduct and violation of due process rights.

## 6. Pattern of Prosecutorial Entrapment and Criminal Conspiracy

The prosecution's criminal conduct extends beyond the CRNA impersonation to include a systematic pattern of entrapment attempts orchestrated through compromised individuals and government informants.

**Timeline of Prosecutorial Entrapment Scheme:**

**Q2 2012:** State Representative Mac McCutcheon was asked to "check out" Dr. Shelinder Aggarwal, who was involved with Compass Laboratories. This request appears to have originated from prosecutorial authorities seeking to position Dr. Aggarwal as an asset for future entrapment operations.

**2016-2018:** Dr. Aggarwal repeatedly contacted Petitioner's cell phone requesting meetings at an ice cream parlor in Huntsville. During this single meeting, Dr. Aggarwal asked Petitioner to "go pickup a box of money for him from Brian Bowman for legal fees." Petitioner declined these requests. Petitioner believes this box of money would later be the subject of a quid pro quo outlined in previous filings and audio evidence. These entrapment activities were conducted while Jay Town served as Acting United States Attorney, with

Assistant US Attorney JB Ward operating under his supervisory authority and direction.

**Government Discovery Revelation:** These entrapment attempts "would show up in the government's discovery," confirming that the prosecution was aware of and likely orchestrating these meetings as "wired events" designed to entrap Petitioner. "Wired events included Brooks Klingenbeck the previous stepson of Jannie Chapman owner of Compass going to John Robsons house, conducted by the FBI, orchestrated by Ward and these recordings further confirm the evidence presented so far." John Robson is another defendant prosecuted by Ward, which shows a pattern of entrapment with a conflict of interest seeking to acquire Compass Laboratories with Bartley Loftin in the middle who became an owner and who boasts of his relationship with and under the "veil" of protection of Jay Town. Klingenbeck is a known trusted government whistleblower for health care fraud.  He is the prime player in several qui tam lawsuits which have resulted in large payouts to him personally and has been used by Loftin as a Relator.

**Connection to US Attorney Jay Town:** The evidence suggests these operations were orchestrated by then-US Attorney Jay Town, who maintained close personal relationships with Mac McCutcheon and had direct involvement in targeting Petitioner.

**Dr. Aggarwal's Sentencing:** Dr. Aggarwal was subsequently sentenced to 15 years, indicating his cooperation with prosecutorial authorities in exchange for consideration or as part of a plea agreement. His sentence was later commuted.

## 7. Systematic Prosecutorial Criminal Enterprise

This evidence reveals that Prosecutor Ward was "again trying to trap Hornbuckle through

Bowman," establishing a criminal pattern of prosecutorial conduct that includes:

**Multiple Criminal Violations:**

- **18 U.S.C. § 371 - Conspiracy:** The prosecution engaged in conspiracy to entrap Petitioner through coordinated use of informants and compromised individuals
- **18 U.S.C. § 1503 - Obstruction of Justice:** Using criminal methods to manufacture evidence constitutes obstruction of justice
- **18 U.S.C. § 1341/1343 - Wire/Mail Fraud:** Using telecommunications to perpetrate fraudulent schemes against Petitioner

**Due Process Violations:** The systematic nature of these entrapment attempts violates

fundamental due process under:

- **Entrapment Doctrine:** Government inducement of criminal conduct through persistent solicitation
- **Outrageous Government Conduct:** The prosecution's criminal behavior "shocks the conscience" and violates due process
- **Brady/Giglio Violations:** Failure to disclose the government's role in orchestrating these entrapment attempts

## 8. Compromised Prosecutorial Relationships

The evidence reveals compromising relationships that create actual conflicts of interest:

**Mac McCutcheon's Dual Role:** Speaker of the House of Alabama McCutcheon served simultaneously as:

- Political facilitator for Petitioner's business (obtaining AG approval for PSA), BCBS in network Credentialing for Compass Labs, and acted as "Media Liason" for QBR LLC, which included QBR becoming recognized by Alabama House of Representatives and Senate through approved Resolution HJR 171
- Government asset conducting "checkout" operations on potential targets
- Conduit between prosecution and targeted individuals

**Jay Town's Personal Involvement:** Former US Attorney Jay Town's close friendship with

Mac McCutcheon and direct involvement in targeting Petitioner creates prosecutorial

conflicts that extend beyond the current prosecution team. Email evidence in **Exhibit B** establishes that Town was directly aware of Ward's criminal impersonation of a CRNA and considered such conduct to be "criminal." Town's knowledge that his subordinate was committing federal crimes while prosecuting healthcare fraud cases creates an irreconcilable conflict that taints the entire prosecution.

**Brian Bowman as Government Asset:** The repeated attempts to use Bowman as an intermediary for entrapment operations, combined with his text message communications with Attorney Loftin **(Exhibit A),** establishes his role as a government informant or cooperating witness.

**Attorneys Tommy Spina and Steven Money as Additional Witnesses:** The email communications in **Exhibit B** identify Tommy Spina and Steven Money as material witnesses with knowledge of prosecutorial criminal conduct and Jay Town's reaction to Ward's impersonation of a CRNA and Loftin's throwing names around to threaten and influence.

**AUSA JB Ward knows Bartley Loftin personally,** the attorney who represented McCutcheon against Hornbuckle and is now owner in Compass Laboratories. Loftin made verbal threats to Hornbuckle of being indicted through a weaponized DOJ, bolstering from his relationship with Town and Ward. It is noteworthy that Bowman had been paying a consulting fee to Mac McCutcheon but stopped. Hornbuckle was told to deliver a message to reassume payments by McCutcheon. Loftin also tried to arrange a meeting between Brian Bowman and Mac McCutcheon to discuss resuming payments to McCutcheon's consulting firm, or he would find himself in an investigation and that he needed to be disciplined. Bowman declined and received a federal subpoena the following month. It is also worth noting that Chris McCutcheon approached Bowman about starting up another NCV company and Bowman declined, saying he was loyal to Hornbuckle. Yet, Chris makes

him a defendant along with Hornbuckle in the Qui Tam two days after wanting to be his business partner. Bowman was instructed via email by Chris McCutcheon CFO of QBR LLC to mail a monthly consulting fee to QBR. Chris McCutcheon named the fee amount expected.

## 9. Prosecutorial Immunity Does Not Apply

Prosecutorial immunity does not extend to clearly criminal conduct undertaken outside the scope of prosecutorial duties. The systematic entrapment scheme, impersonation of medical professionals, and conspiracy to manufacture evidence are not legitimate prosecutorial functions and therefore receive no immunity protection. No statute of limitations on FRAUD.

## 10. Suborning Perjury and False Testimony at Sentencing

The prosecution's misconduct extends to the presentation of false testimony during Petitioner's sentencing hearing, constituting suborning of perjury under 18 U.S.C. § 1622 and obstruction of justice under 18 U.S.C. § 1503.

**FBI False Testimony Regarding Medical Claims Billing:**

During the sentencing hearing, FBI agents testified under oath that Petitioner "billed medical claims," when the prosecution knew or should have known this testimony was false. The record establishes that:

• Petitioner never billed any medical insurance claims

• All billing activities were conducted by healthcare facilities, not by Petitioner

• Petitioner's role was limited to providing diagnostic services under physician referral

• The prosecution's own evidence contradicts the FBI's sworn testimony

This false testimony was material to the Court's sentencing determination and was used by Assistant U.S. Attorney Ward to secure sentencing enhancements that would not have been available based on truthful testimony. Petitioner never billed medical claims, they

were billed by Derby Medical owned by Dr. Eric Beck.

All elements are satisfied here, as the prosecution and defendant's attorney knew Hornbuckle never billed claims. Known perjured testimony was orchestrated by Ward to obtain sentence enhancements as defense attorney Pulliam sat silent without objection.

**Legal Standards for Suborning Perjury:**Under 18 U.S.C. § 1622, it is a federal crime to "procure" another person to commit perjury.

The elements include:

• A witness testified falsely under oath in a federal proceeding

• The false testimony was material to the proceeding

• The prosecution knew or believed the testimony would be false

• The prosecution influenced, induced, or procured the false testimony

All elements are satisfied here, as the prosecution knew Petitioner did not bill medical claims yet presented FBI testimony to the contrary for the express purpose of obtaining sentencing enhancements.

**Constitutional Violations: Brady/Giglio Violations in Presenting False Testimony:**

The prosecution's presentation of false testimony violates fundamental due process under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). Courts have consistently held that prosecutors violate due process when they:

• Present testimony they know or should know is false

• Fail to correct false testimony when it becomes apparent

• Use false testimony to secure unfair advantage in sentencing

In Napue v. Illinois, 360 U.S. 264, 269 (1959), the Supreme Court held that "the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."

**18 U.S.C. § 1503 Obstruction of Justice:**

The prosecution's conduct constitutes obstruction of justice by:

• Corrupting the truth-finding function of the sentencing hearing

• Presenting false evidence to influence the Court's judgment

• Using perjured testimony to secure enhanced penalties

• Failing to correct known false testimony

**Professional Ethics Model Rule 3.3 Professional Responsibility Violations:**

The prosecution violated Model Rule 3.3(a)(3), which prohibits lawyers from "knowingly offer[ing] evidence that the lawyer knows to be false." When false evidence is presented, prosecutors have an affirmative duty under Rule 3.3(a)(3) to "take reasonable remedial measures, including, if necessary, disclosure to the tribunal."

Assistant U.S. Attorney Ward's failure to correct the FBI's false testimony, and his use of that testimony to argue for sentencing enhancements, constitutes a clear violation of professional ethical standards that mandate disqualification.

**Pattern of Prosecutorial Deception:**

This false testimony regarding medical claims billing is part of a broader pattern of prosecutorial deception that includes:

• Characterizing death threats as "hyperbole"

• Impersonating medical professionals during investigation

• Misrepresenting healthcare service classifications under federal law

• Using inadmissible hearsay testimony from unrelated cases

• Systematic entrapment attempts through government informants


The cumulative effect of these deceptive practices demonstrates that the prosecution cannot fairly represent the United States' interests and must be disqualified under Young v. United States ex rel. Vuitton et Fils S.A.

# H. SELECTIVE PROSECUTION VIOLATING EQUAL PROTECTION

### 1. Constitutional Violation Through Discriminatory Enforcement:

The prosecution's selective enforcement creates a separate constitutional violation requiring disqualification under the Equal Protection Clause of the Fourteenth Amendment.

**Similarly Situated Individuals - Comparative Analysis:**

| Factor | Chris McCutcheon | Defendant Hornbuckle |
|---|---|---|
| Business Structure | PSA-based diagnostic services via QBR | PSA-based diagnostic services |
| Legal Compliance | Healthcare attorney consultation | Healthcare attorney consultation |
| AG Approval | Facilitated through Mac McCutcheon | Received through Mac McCutcheon |
| Conduct Period | 2008-2017 | 2008-2017 |
| Government Knowledge | Full disclosure through Qui Tam filing | Full disclosure through investigation |
| Legal Outcome | Civil settlement + $99M bounty opportunity | Criminal prosecution + imprisonment |
| Political Connections | Mac McCutcheon (State Rep/Speaker) | None |

## 2. Evidence of Discriminatory Intent:

### Political Considerations in Charging Decisions:

- Defense counsel's recorded statement: prosecution represents "weaponization of

    DOJ used as calculated intentional targeting"

- McCutcheon's dual role as both target and government asset

- Prosecutorial relationships with Chris McCutcheon's counsel (Bartley Loftin)

- Jay Town's personal friendship affecting prosecutorial discretion

### Temporal Evidence of Selective Targeting:

- March 24, 2017: McCutcheon receives civil settlement AND files Qui Tam

- Christmas Eve 2017: Final payment to McCutcheon from QBR

- January 2018: DOJ subpoena to Petitioner (weeks after McCutcheon payments end)

- Timeline suggests coordinated effort to protect informant while targeting petitioner

## 3. Lack of Legitimate Prosecutorial Purpose:

### Identical Legal Standards Applied Differently:

- Both cases involved same healthcare service classifications

- Both operated under attorney-approved PSA structures

- Both had identical Stark Law and Anti-Kickback compliance

- Different outcomes cannot be explained by legal distinctions

### Prosecutorial Resources Misallocation:

- Extensive resources devoted to criminalizing attorney-approved conduct

- Simultaneous protection of identical conduct when politically connected

- Selective enforcement undermines deterrent effect of healthcare fraud

    Prosecutions

### 4. Remedial Measures Required:

**Disqualification Necessary for Equal Protection:** The prosecution cannot cure selective prosecution violations while defending their own discriminatory charging decisions. Disqualification is required because:

- Current prosecutors have vested interest in justifying selective enforcement
- Appearance of impropriety cannot be remedied without substitute counsel
- Constitutional violations require independent prosecutorial review

# I. Request for Subpoena Authority and Witness Testimony

## 1. Legal Foundation for Subpoena Authority

Under Fed. R. Crim. P. 17 and the Court's inherent authority to ensure fair proceedings, Petitioner requests the Court issue subpoenas for testimony and documents essential to establishing prosecutorial misconduct and criminal conduct requiring disqualification.

## 2. Material Witnesses

**Attorney Bartley Loftin** and **Brian Bowman** are material witnesses whose testimony is essential to establishing:

- The prosecutor's premeditated plan to impersonate a CRNA
- Communications documenting the criminal conspiracy to entrap Petitioner
- Evidence of prosecutorial knowledge that their conduct violated federal law
- The scope and extent of prosecutorial misconduct in this case

**Attorneys Tommy Spina and Steven Money are additional material witnesses** whose testimony is essential to establishing:

- Jay Town's knowledge of Ward's criminal impersonation of a CRNA

- Town's specific characterization of Ward's conduct as "criminal"
- The extent of supervisory knowledge regarding prosecutorial misconduct
- Communications documenting high-level awareness of illegal conduct within the US Attorney's Office

## 3. Relevance and Necessity

The text message communications between Loftin and Bowman **(Exhibit A)** and the email

communications between Tommy Spina and Steven Money, and Spina and Brian Bowman

**(Exhibit B)** are directly relevant to:

- Petitioner's motion to disqualify based on prosecutorial criminal conduct
- The Court's obligation to ensure prosecutorial integrity under *Young v. United States ex rel. Vuitton*
- Petitioner's constitutional rights under the Due Process Clause
- Potential criminal referral of prosecution counsel
- Establishing supervisory knowledge and approval of criminal conduct

## 4. No Alternative Means of Obtaining Evidence

The text messages and related communications are uniquely within the possession and

knowledge of these witnesses. No alternative method exists to obtain this critical

testimonial evidence of prosecutorial misconduct.

## 5. Proposed Scope of Additional Witness Testimony and Document

Production

**Dr. Shelinder Aggarwal Testimony:**

- Role in prosecutorial entrapment scheme from 2012-2018
- Instructions received from government authorities regarding Petitioner
- Communications with Brian Bowman, Bartley Loftin, Mac McCutcheon, Jay Town, JB Ward or other government officials
- Details of cooperation agreement or plea negotiations
- Knowledge of government surveillance during ice cream parlor meeting

**Enhanced Document Production:**

- All government discovery materials documenting entrapment attempts
- Recordings or transcripts from ice cream parlor meeting
- Communications between Dr. Aggarwal and government authorities
- Mac McCutcheon's communications with prosecutorial authorities regarding "checkout" operations
- Jay Town's communications regarding targeting of Petitioner
- All email communications between Tommy Spina, Steven Money, Bartley Loftin, and Brian Bowman relating to Ward's criminal conduct

**Witnesses should be compelled to testify regarding:**

- All communications relating to the prosecutor's plan to impersonate medical professionals
- Knowledge of prosecutorial misconduct in this case
- Any discussions regarding the propriety or legality of impersonation tactics
- Communications with prosecution team regarding investigation methods
- Jay Town's reaction to and characterization of Loftin's or Ward's criminal conduct

**Document production should include:**

- All text messages between Loftin and Bowman from [relevant time period]**(see Exhibit A)**
- Email communications regarding the investigation
- All email communications between Tommy Spina, Steven Money, and/or Brian Bowman **(see Exhibit B)**
- Any recordings or transcripts of conversations about prosecutorial tactics
- Documents relating to the impersonation of medical professionals

# V. RELIEF REQUESTED

WHEREFORE, Petitioner respectfully motions this Court:

1. **Disqualify** United States Attorney Prim F. Escalona and Assistant United States

   Attorney John B. Ward from further participation in this matter pursuant to Young v.

   United States ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987);

2. **Order** the appointment of substitute counsel from outside the Northern District of

   Alabama or request intervention by the Attorney General pursuant to:

   - DOJ Manual EOUSA Title 3-1.140
   - 28 U.S.C. § 515 (Attorney General's authority to appoint special prosecutors)
   - 28 C.F.R. § 600.1 et seq. (Special Counsel regulations)


3. **Grant** an evidentiary hearing to present witnesses, affidavits, and evidence

   supporting this motion, consistent with the procedures outlined in United States v.

   Vonn, 348 F.3d 697 (9th Cir. 2003).

4. **Order** production of all communications between the prosecution and defense

   counsel Maxwell H. Pulliam and/or Joshua Lowther regarding the recorded

   statements and plea negotiations referenced herein.

5. **Order** an investigation into potential ex parte communications between the

   prosecution, defense counsel, and former Judge L. Scott Coogler regarding the "fix

   being in, politically" as documented in the audio recordings.

6. **Grant** such other relief as the Court deems just and proper under the

   circumstances.

7. **Order dismissal of all charges** based on prosecutorial misconduct and failure to

   establish required mens rea under *Elonis v. United States* and related Supreme

   Court precedent.

8. **Conduct evidentiary hearing** on the prosecution's mischaracterization of

   healthcare service classifications and failure to acknowledge controlling legal

   precedent.

9. **Order production of all prosecutorial memoranda** regarding the classification of Nerve Conduction and Somatosensory Evoked Potential Diagnostics under the Stark Law and Anti-Kickback statutes.

10. **Grant sanctions** against prosecution counsel for pursuing charges based on fundamental misinterpretation of applicable healthcare fraud statutes and Supreme Court precedent regarding mens rea requirements.

11. **Order appointment of independent counsel** to review whether the prosecution's conduct in this case violates Department of Justice guidelines and ethical standards.

The prosecution's failure to recognize basic legal principles regarding healthcare service classifications, combined with their dismissal of extensive legal compliance efforts as "hyperbole," demonstrates both actual conflicts of interest and an appearance of impropriety that mandates immediate disqualification and appointment of substitute counsel.

12. **Order evidentiary hearing on selective prosecution claims, including:**

Comparative analysis of prosecution decisions for similarly situated defendants, Discovery regarding Christopher McCutcheon prosecution declination decision, Investigation of differential treatment based on political connections, and Review of all cases involving False Claims Act informants receiving civil rather than criminal treatment

13. **Order production of all documents relating to selective prosecution evidence including:**

Prosecutorial declination memoranda regarding Chris McCutcheon,

Communications regarding political considerations in charging decisions,

Comparative case files involving PSA-based healthcare arrangements, and All

documents relating to Qui Tam financial incentives affecting prosecution decisions

14. **Grant sanctions for selective prosecution violating Equal Protection Clause and order:**

Investigation of systematic bias in prosecution decisions, a review of all cases where

political connections affected charging outcomes, and remedial measures to ensure

equal treatment under law, this case in particular

15. **Order dismissal of all charges based on selective prosecution violating Equal Protection Including:**

Discriminatory enforcement based on political connections, identical conduct

receiving different treatment based on impermissible factors, prosecutorial

vindictiveness demonstrated through comparative evidence, and Constitutional

violation requiring dismissal as appropriate remedy

16. **Order criminal investigation** of prosecution counsel for violations of 18 U.S.C. §§

912, 913, and 1347 based on impersonating a Certified Registered Nurse

Anesthetist during the investigation;

17. **Order criminal investigation** of prosecution counsel for suborning perjury under 18

U.S.C. § 1622 and obstruction of justice under 18 U.S.C. § 1503 based on presenting

false FBI testimony that Petitioner "billed medical claims" when the prosecution

knew this testimony was false;

18. **Order vacation of sentence** based on the prosecution's use of perjured testimony to secure unlawful sentencing enhancements;

19. **Order vacation of sentence** to remove total amount of restitution, fines, fees, and foreclosures;

20. **Grant motion to suppress all evidence** obtained through the prosecutor's criminal impersonation of a medical professional as fruit of the poisonous tree to include all emails and corporate documents provided to the DOJ through False Claim Act Qui Tam Subpoena;

21. **Conduct evidentiary hearing** on the prosecution's presentation of false testimony regarding medical claims billing and failure to correct known perjury during sentencing proceedings;

22. **Order production of all communications** between prosecution counsel and FBI agents regarding testimony about medical claims billing, including any preparation materials, witness interviews, or briefing documents;

23. **Issue subpoenas for testimony** from FBI agents who provided false testimony regarding medical claims billing at the sentencing hearing;

24. **Order production** of all sentencing memoranda, witness preparation materials, and communications regarding the FBI testimony about medical claims billing;

25. **Issue subpoenas for testimony** from Attorney Tommy Spina and Attorney Steven Money regarding their email communications **(Exhibit B)** documenting Jay Town's knowledge of and reaction to Ward's criminal impersonation of a CRNA

**26. Order production of all communications and evidence** related to the prosecutor's impersonation of a CRNA, including any recordings, transcripts, or documentation of this criminal conduct;

**27. Issue subpoenas for testimony** from Attorney Bartley Loftin and Brian Bowman regarding their text message communications **(Exhibit A)** documenting the prosecutor's impersonation of a CRNA and related criminal conduct;

**28. Issue subpoenas for testimony** from Dr. Shelinder Aggarwal regarding his role in the prosecution's entrapment scheme and his communications with prosecutorial authorities from 2012-2018;

**29. Order production of all text messages, communications, and electronic records** between Attorney Bartley Loftin and Brian Bowman relating to the prosecution's investigation, including but not limited to communications regarding impersonation of medical professionals (in addition to those already provided as Exhibit A);

**30. Order production of all email communications** between Attorney Tommy Spina, Attorney Steven Money, and/or Brian Bowman relating to Ward's criminal conduct and Jay Town's knowledge thereof (in addition to those already provided as Exhibit B).

**31. Order production of all government discovery materials** documenting the Dr. Aggarwal entrapment attempts, including recordings, transcripts, and surveillance materials from the ice cream parlor meeting;

32. **Grant sanctions** against prosecution counsel for presenting perjured testimony and failing to correct known false evidence during sentencing proceedings, including all other misconduct evidenced in this motion; entrapment, impersonation, selective prosecution, obstruction, impropriety of judicial process...

33. **Order evidentiary hearing** on the systematic pattern of prosecutorial entrapment, criminal conduct, and abuse of process spanning from 2012 through the present prosecution;

34. **Refer prosecution counsel to appropriate disciplinary authorities** for criminal conduct and professional ethics violations, including suborning perjury and obstruction of justice;

35. **Order appointment of independent counsel** to review whether the prosecution's conduct in this case violates Department of Justice guidelines and ethical standards.

36. **Issue subpoenas for testimony** from Brooks Klingenbeck regarding his role in the prosecution's entrapment scheme and his communications with prosecutorial authorities from 2012-2018;

37. **Order production of 302s** from Jason Cox and former AG Luther Strange (Form FD-302);

38. **Issue subpoenas for testimony and production of all communications with DOJ** from Chester Mac McCutcheon regarding Qui Tam and prosecution of Petitioner

39. **Issue subpoenas for testimony and production of all communications** with Luther Strange from Chester Mac McCutcheon regarding PSA and his introduced HJR 171, a resolution recognizing April 2013 as "Neuropathy Awareness Month"

**40. Issue subpoenas for testimony from** Chester Mac McCutcheon regarding

differential treatment discussions

**41. Issue subpoenas for testimony** from Jay Town regarding factors influencing charging

Decisions, including Ward and Loftin's behavior

**42. Issue subpoenas for testimony** from DOJ officials regarding prosecution decision-

making criteria

**43. Issue subpoenas for testimony** from health care attorney Clark Pendegrass

regarding Professional Services Agreement.

**44. Grant sanctions** against former Defense Attorneys Maxwell Pulliam and Joshua

Lowther for ineffective assistance of counsel, breach of contract, collusion and

conflict of interest, coercion and duress through threats and intimidation,

racketeering, ethical violations

**Support for sanctions include:**

- Frivolous litigation tactics
- Discovery abuse
- Misrepresentation to the court
- Client confidentiality breaches
- Financial improprieties
- Threats or intimidation tactics
- Misrepresentation of legal consequences
- Pressure to accept unfavorable settlements
- Coordination with opposing parties against client's interests
- Undisclosed conflicts of interest
- Breach of duty of loyalty
- Failure to perform agreed-upon services
- Abandonment of representation without proper withdrawal
- Violation of specific contractual obligations
- Failure to investigate crucial evidence
- Missed deadlines or procedural requirements
- Inadequate preparation for hearings/trial

The prosecution's failure to recognize basic legal principles regarding healthcare service

classifications, combined with their dismissal of extensive legal compliance efforts as

"hyperbole," demonstrates both actual conflicts of interest and an appearance of

impropriety alone mandates immediate disqualification and appointment of substitute

counsel.

# VI. CONCLUSION

The recorded statements by defense counsel, combined with the prosecution's knowledge

and inadequate response to these statements, create both actual conflicts and an

appearance of impropriety that mandate disqualification under federal law and ethical

standards. As the Supreme Court emphasized in Young v. United States ex rel. Vuitton,

prosecutors must be "disinterested" and free from conflicts that might compromise their

judgment.

The prosecution's pattern of misconduct, including the characterization of documented

death threats as "mere hyperbole," their criminal impersonation of a medical professional,

their presentation of perjured testimony at sentencing, their failure to investigate potential

coercion, and their continued representation despite knowledge of these serious

allegations violate:

- The Due Process Clause of the Fifth Amendment
- Professional Conduct Rules 3.3, 3.4, and 3.8
- The fundamental principles established in Brady v. Maryland and Giglio v. United States
- The prosecutorial standards set forth in Berger v. United States
- Federal criminal statutes including 18 U.S.C. §§ 912, 913, 1347, 1622, and 1503

**Documentary Evidence of Systematic Criminal Conduct:** The text message communications in **Exhibit A** between Attorney Bartley Loftin and Brian Bowman provide direct documentary evidence of Assistant U.S. Attorney Ward's premeditated plan to impersonate a Certified Registered Nurse Anesthetist (CRNA) during the investigation to entrap Petitioner. These communications establish not only the criminal nature of Ward's conduct but also the coordinated conspiracy to violate federal healthcare fraud statutes while simultaneously prosecuting others for similar conduct.

Even more damning is the email evidence in **Exhibit B** between Attorney Tommy Spina and Attorney Steven Money, and Spina and Brian Bowman, which reveals that then-Acting U.S. Attorney Jay Town was directly aware of Ward's criminal impersonation and specifically considered Ward's conduct to be "criminal." The emails establish that Town was "upset" about Ward's impersonation of a CRNA, demonstrating supervisory knowledge and disapproval of the criminal conduct occurring within his office.

**Supervisory Criminal Liability and Office-Wide Corruption:** Jay Town's knowledge that his subordinate Assistant U.S. Attorney Ward was committing federal crimes while prosecuting healthcare fraud cases creates an unprecedented conflict that transforms individual prosecutorial misconduct into an office-wide criminal conspiracy. The fact that the Acting U.S. Attorney recognized Ward's conduct as "criminal" yet failed to take appropriate disciplinary or corrective action demonstrates a complete breakdown in prosecutorial integrity that extends far beyond Ward's individual misconduct. This supervisory knowledge and inaction create multiple additional violations:

- 18 U.S.C. § 371 - Conspiracy to commit federal crimes
- 18 U.S.C. § 1503 - Obstruction of justice through willful blindness to subordinate criminal conduct
- 18 U.S.C. § 4 - Misprision of felony for failing to report known federal crimes
- Professional responsibility violations for allowing criminal conduct to continue

**Pattern of Prosecutorial Criminal Enterprise:** The evidence establishes a systematic pattern of criminal conduct that includes:

1. Ward's Criminal Impersonation: Direct violation of 18 U.S.C. §§ 912, 913, and 1347 through impersonating a CRNA
2. Town's Criminal Conspiracy: Knowledge and tacit approval of subordinate criminal conduct
3. Systematic Entrapment Scheme: Coordinated use of informants and compromised individuals to manufacture criminal conduct
4. Suborning Perjury: Presentation of false FBI testimony regarding medical claims billing
5. Brady/Giglio Violations: Systematic suppression of exculpatory evidence
6. Obstruction of Justice: Using criminal methods to secure convictions

**Material Witness Testimony:** The Court now has identified material witnesses whose testimony is essential to establishing the full scope of prosecutorial criminal conduct:

- Attorney Bartley Loftin and Brian Bowman can testify regarding Ward's premeditated plan to impersonate a CRNA **(Exhibit A)**
- Tommy Spina and Steven Money can testify regarding Jay Town's knowledge that Ward's conduct was "criminal" **(Exhibit B)**
- Dr. Shelinder Aggarwal can testify regarding the systematic entrapment scheme from 2012-2018
- FBI agents can be questioned regarding their perjured testimony about medical claims billing

**Selective Prosecution as Disqualifying Conflict:**

The evidence establishes that Petitioner was selected for criminal prosecution while Chris

McCutcheon received no prosecutorial investigation, instead given protection and bounty

pursuit for identical conduct based solely on political connections and financial incentives

favoring the government's Qui Tam recovery. This selective enforcement creates both

actual conflicts of interest and an appearance of impropriety that makes fair prosecution

impossible.

The constitutional violation is clear: identical PSA-based diagnostic services, identical

legal compliance efforts, identical attorney consultation, but dramatically different legal

outcomes based on political protection rather than legal merit. When the government's

potential recovery from McCutcheon's Qui Tam creates financial incentive to

prosecute Petitioner while protecting McCutcheon, the prosecution cannot maintain the

requisite neutrality and impartiality.

The systematic pattern of discriminatory enforcement—protecting politically connected

defendants while targeting those without protection—undermines the fundamental

constitutional principle of equal treatment under law. A reasonable observer would

conclude that prosecution decisions are based on political considerations rather than

legitimate law enforcement purposes, creating an appearance of impropriety that

mandates disqualification under Young v. United States ex rel. Vuitton et Fils S.A.

The selective prosecution evidence amplifies and provides context for all other

prosecutorial misconduct documented in this motion. The death threats characterized as

"hyperbole," the criminal impersonation of medical professionals, the presentation of

perjured testimony, and the systematic entrapment attempts all serve the underlying

discriminatory purpose of targeting Petitioner while protecting politically connected individuals engaged in identical conduct.

This is not merely prosecutorial misconduct, it is systematic selective enforcement designed to achieve discriminatory outcomes based on political considerations. Such fundamental constitutional violations cannot be remedied while the conflicted prosecutors remain on the case, requiring immediate disqualification and appointment of substitute counsel who can evaluate this case based on legal merit rather than political expediency.

**Irreconcilable Conflicts Requiring Disqualification:**

The cumulative effect of the prosecution's criminal conduct, suborning of perjury, systematic entrapment attempts, and fundamental misunderstanding of applicable healthcare statutes creates such pervasive conflicts that no reasonable observer could have confidence in their ability to fairly represent the United States' interests. When the Acting U.S. Attorney himself acknowledges that his subordinate's conduct is "criminal," yet the prosecution continues, the entire prosecutorial enterprise becomes compromised beyond redemption. The government cannot prosecute healthcare fraud while simultaneously committing healthcare fraud. The government cannot prosecute criminal impersonation while engaging in criminal impersonation. The government cannot seek justice while systematically obstructing justice through perjured testimony and evidence suppression.

The integrity of the judicial process and Petitioner's constitutional rights require immediate disqualification of current counsel and appointment of substitute prosecutors who can

proceed without the conflicts that have compromised this case. The documentary

evidence in Exhibits A and B provides irrefutable proof that this prosecution has been

tainted by criminal conduct from its inception and must be transferred to prosecutors who

have not engaged in the very crimes they seek to prosecute.

## SERVICE

This motion is being served on the United States Attorney General Pamela Bondi, at the U.S.
Department of Justice 950 Pennsylvania Avenue NW Washington D.C. 20530.
This motion is also being served on the United States Attorney PRIM F. ESCALONA, Assistant U.S.

Attorney J.B.  Ward, at the U.S. Department of Justice for the Northern District of Alabama 1801

Fourth Avenue North Birmingham Alabama 35203-2101, and the Clerk of Court, Greer M. Lynch.

## CERTIFICATION

I hereby certify that a copy of this motion was served on the Clerk of Court, Greer M. Lynch, US

DISTRICT COURT for the NORTHERN DISTRICT of ALABAMA, the United States Attorney General

Pamela Bondi, at the U.S. Department of Justice, and the United States Attorney Prim F.

Escalona, Assistant U.S. Attorney J.B.  Ward, at the U.S. Department of Justice for the Northern

District of Alabama.

**CERTIFICATE OF NOTICE OF SERVICE**

JUDGE OF THE DISTRICT COURT OF ALABAMA, HONORARY LILES C. BURKE UNITED STATES

DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

Because this MOTION is submitted Pro Se it is requested that it be liberally construed in

accordance with Haines v. Kerner, 404 U.S.C. 519, 529, (1972), and hold Mr. Hornbuckle to less

stringent, in standard, than formal pleadings drafted by lawyers. Wherefore the reasons stated, Mr.

Hornbuckle amicably PRAY that this Honorable Court GRANT the MOTION as submitted.

**CERTIFICATE OF SERVICE**

I, John Scott Hornbuckle, certify that on _16th August_ 2025, by mail this submission and any

exhibits attached were sent to the Clerk of Court's Office to be docketed and by this said office,

made electronically available to all attorneys or record including the United States Attorney of the

Northern District of Alabama as well as the Honorable Attorney General of The United States of

America.


Respectfully Submitted,


John Scott Hornbuckle
Register Number 96094-509
Pensacola FPC
P.O. Box 3949
Pensacola, FL 32516

John Hornbuckle
# 96094-509
FPC
P.O. Box 3949
Pensacola, FL. 32516



CERTIFIED MAIL

9589 0710 5270 2298 4221 58

UNITED STATES DIST
NORTHERN DISTRICT OF
ATTN: Greer M. Lynch
        Clerk of Court  Rm 140
        Honorable Judge Liles C.

1729 5th Avenue North

Birmingham, AL. 25203-2040